Davear **WHITTLE, Defendant Below Appellant,**

v.

**STATE of Delaware, Plaintiff Below Appellee.**

No. 603, 2012.

Supreme Court of Delaware.

Submitted July 17, 2013.

Decided Oct. 4, 2013.

Corrected: Oct. 8, 2013.

irrespective of how well the issue was pre-    served at trial.'').

Nicole M. Walker, Office of the Public Defender, Wilmington, Delaware for appellant.

Maria T. Knoll, Department of Justice, Wilmington, Delaware for appellee.

Before STEELE, Chief Justice, BERGER and JACOBS, Justices.

STEELE, Chief Justice:

In a trial focusing primarily on the testimony of three key witnesses, a Superior Court jury found Defendant–Appellant Davear Whittle guilty of Murder in the Second Degree, Possession of a Firearm During the Commission of a Felony, Reckless Endangering in the First Degree, and Possession of a Firearm by a Person Prohibited. This appeal addresses whether the prosecutor improperly vouched for the credibility of those three witnesses in his closing argument, by stating that they were "right" or "correct" at least 20 times. We conclude that the prosecutor's conduct about which Whittle complains amounts to improper vouching and constitutes plain error. Therefore, we REVERSE the judgment of the Superior Court and REMAND for a new trial.

## I. FACTUAL AND PROCEDURAL HISTORY

On August 1, 2010, around 10 p.m., Namil Owens, Donald Williams, LeAndre Prince, and another man drove to 330 Townsend Street in Southbridge, Delaware. There, Prince bought marijuana from various people on the street. Owens and Williams then dropped off Prince and the other man at the Winchester Bridge in Southbridge and headed back to Townsend Street to buy more drugs, and possibly attempt to scam the drug dealers.

When they arrived back at Townsend Street, Owens parked behind a Ford Taurus outside 328 Townsend Street. Cammellia Stewart, who lived at 328 Townsend Street, and her friend Mia Biddle, were sitting in the Taurus. Leaving Williams in the passenger seat, Owens got out of his car and unsuccessfully attempted to buy drugs from Davear Whittle, who is nicknamed "Snizz." When Owens returned to his car, another man approached Owens' window and asked Owens and Williams if they were the ones who wanted to buy marijuana. Owens responded that they were no longer interested. Williams then yelled, "[H]e's pulling out a gun," apparently referring to the man standing at Owens' window. But before the man at Owens' window could pull out his gun, Owens heard shots fired "on the passenger side from the rear of the car." Upon hearing the shots, Owens immediately drove away. After driving a couple of blocks, Owens pulled over and discovered that Williams was dead. Owens then

called the police and walked away, leaving the car behind.

At trial, the testimony of Biddle, Stewart, and Owens comprised most of the State's evidence. Stewart and Biddle knew Whittle by the name of Snizz because he dated Stewart's sister. Biddle testified that she ducked down in her car upon hearing gunshots, but was still able to see Whittle shooting from some steps through the back passenger window. After the shooting, Biddle saw Whittle running into Stewart's house with a gun. She could not tell if there was more than one shooter. Stewart testified at one point that she saw Whittle shoot at Owens' car, but during cross-examination testified that she ducked after the shooting started and did not actually see Whittle firing a gun. After Stewart looked up, she saw Whittle running into her house, but did not see him carrying a gun. Owens, who was admittedly high on heroin the day of the shooting, also testified that he did not see a shooter and was unsure whether there was more than one person shooting.

The testimony of Biddle, Stewart and Owens is replete with contradictions and inconsistencies. Stewart initially testified that she saw Whittle shooting at Owens' car, but later Stewart admitted that she did not see Whittle shooting, or even carrying, a gun. Biddle testified that she could see Whittle clearly during the shooting because he was standing under a street light; however, Stewart testified that the street light outside her house was not working and there were only two other streetlights in the area. One streetlight was a couple of doors up and the other was across the street. Biddle and Stewart testified that Whittle told them the bandage on his leg covered up a fresh tattoo, but medical records showed that the bandage

was actually treatment for a burn. In an initial photograph lineup, Stewart did not point out Whittle to the police, yet she identified him more than a week later and then again at trial.[1] Stewart also testified that Whittle had a tattoo on his arm that read "S–B," but a photograph introduced into evidence by the State showed that Whittle did not have a tattoo matching that description. Finally, after the shooting occurred and Stewart and Biddle drove off, Stewart testified that it took them only 30 to 45 minutes to return to the scene, while Biddle testified that it took them two or three hours.

Other than that witness testimony, the State presented only a small amount of physical evidence. The State had a forensic firearms expert examine the bullets found in Owens' car. The expert testified that the trajectory of the bullets showed that the shooter must have been standing directly behind Owens' car. The expert further testified that ballistics evidence indicated that at least three of the four bullets recovered were fired from the same gun. No gun was introduced into evidence, however. As mentioned, medical records confirmed that Whittle had a burn on his left leg, which proved relevant to Biddle and Stewart's testimony that Whittle had a bandage on his leg the night of the shooting. Finally, after the shooting, an apparently bloody white t-shirt was found in Stewart's bathroom, but the police never performed a chemical test on that t-shirt to determine whether the substance was actually blood. Although the t-shirt may have had some relevance (because the witnesses testified that Whittle was wearing a white t-shirt on the day of the shooting), its probative value in determining whether Whittle was the shooter seems unclear (and minimal at best).

---

1. At trial, Stewart testified that the reason she did not point out Whittle during the initial photograph lineup was because she was afraid of Whittle.

In July 2012, a Superior Court jury found Whittle guilty of Murder in the Second Degree, Possession of a Firearm During the Commission of a Felony, Reckless Endangering in the First Degree, and Possession of a Firearm by a Person Prohibited. During his closing argument, the prosecutor stated at least 20 times that the witnesses were "right" or "correct" about various assertions in their testimony. On this direct appeal, Whittle alleges that the prosecutor improperly vouched for the witnesses, which deprived him of his right to a fair trial.

## II. STANDARD OF REVIEW

■ We review alleged prosecutorial misconduct, such as improper vouching, for plain error where the defendant did not object to the asserted prosecutorial misconduct at trial, and the trial judge failed to intervene *sua sponte*.[2] In plain error review, we examine the record *de novo* to determine whether prosecutorial misconduct occurred.[3]

■ If we determine that the prosecutor did not engage in misconduct, the analysis ends. But, if we find that the prosecutor erred, we apply the *Wainwright v. State*[4] plain error standard, which requires the error to be "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[5] Further, we find plain

error only for "material defects which are apparent on the face of the record[,] which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which show manifest injustice."[6] If we find plain error under *Wainwright*, we must reverse.[7]

■ Lastly, if we conclude that the prosecutor's conduct does not satisfy *Wainwright's* plain error standard, we next proceed to a *Hunter v. State*[8] analysis.[9] *Hunter* requires us to "consider whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process. Again, under the *Hunter* analysis, we can reverse, but need not do so, even if the prosecutorial misconduct would not warrant reversal under the *Wainwright* standard."[10]

## III. ANALYSIS

### A. Improper Vouching

■ "Improper vouching occurs when the prosecutor implies some personal superior knowledge, beyond that logically inferred from the evidence at trial, that the witness testified truthfully."[11] Therefore, prosecutors generally cannot vouch for the credibility of a witness by stating or implying personal knowledge that the witness' testimony is correct or truthful.[12] This

2. *See, e.g., Small v. State*, 51 A.3d 452, 456 (Del.2012); *Hardy v. State*, 962 A.2d 244, 247 (Del.2008); *Baker v. State*, 906 A.2d 139, 150–51 (Del.2006).

3. *Baker*, 906 A.2d at 150.

4. 504 A.2d 1096 (Del.1986).

5. *Id.* at 1100.

6. *Id.*

7. *Baker*, 906 A.2d at 150.

8. 815 A.2d 730 (Del.2002).

9. *Baker*, 906 A.2d at 150.

10. *Id.* (emphasis omitted).

11. *White v. State*, 816 A.2d 776, 779 (Del. 2003).

12. *Clayton v. State*, 765 A.2d 940, 942 (Del. 2001) ("As a general rule, prosecutors may not express their personal opinions or beliefs about the credibility of witnesses or about the truth of testimony.").

Court has established, repeatedly, that this form of prosecutorial misconduct is prohibited.[13]

■ Prosecutors play a unique role in the criminal justice system because "they have the dual obligations of presenting the State's case 'with earnestness and vigor' and the equal 'duty to see that justice be done by giving [the] defendant a fair and impartial trial.'"[14] Predictably, because prosecutors are officers of the court and representatives of the State, "[m]embers of the jury are likely to assume that prosecutors will satisfy their heightened obligations of impartiality."[15] The American Bar Association's *Standards for Criminal Justice* cautions "of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office."[16]

■ Therefore, improper vouching is especially problematic when a witness' credibility is at issue "because jurors may easily interpret vouching by the prosecutor as an official endorsement of the witness."[17] Because improper vouching increases the risk of jurors placing undue weight on prosecutorial statements, "[pros-ecutors] must choose their words in a closing argument with great care."[18]

## B. Did the Prosecutor Improperly Vouch for the Witnesses' Credibility?

On appeal, Whittle claims that the prosecutor engaged in improper vouching, which deprived him of his right to a fair trial[19] by repeatedly stating that the State's three main witnesses were "right" or "correct" in his closing argument. The following excerpts contain the language at issue from the prosecutor's closing argument:[20]

1) May it please the court, counsel. Ladies and gentlemen, Mia Biddle was *right*. It was the defendant standing behind her car, under a street light, shooting at that black Saturn parked just behind hers. Cammellia Stewart was *right*. That was the defendant, limping because of an injury to his leg, who told the men in the black car to park, and, then, who started shooting at the black car as he ran across the sidewalk, up her steps, and into her house at 328 Townsend Street. And Namil Owens was *right*. It was the defendant with whom he had a conversation about buying marijuana, in the 300 block of Townsend Street, just minutes before the bullets started to fly.... That, at

---

13. *See, e.g., Torres v. State,* 979 A.2d 1087 (Del.2009); *Hardy v. State,* 962 A.2d 244 (Del.2008); *Trump v. State,* 753 A.2d 963 (Del.2000); *Brokenbrough v. State,* 522 A.2d 851 (Del.1987); *Hughes v. State,* 437 A.2d 559 (Del.1981).

14. *Trump,* 753 A.2d at 967 (quoting *Bennett v. State,* 164 A.2d 442, 446 (Del.1960)).

15. *Baker,* 906 A.2d at 152.

16. Am. Bar. Ass'n, *Standards for Criminal Justice* 3–5.8 (1993).

17. *Miller v. State,* 750 A.2d 530, 2000 WL 313484, at *4 ¶ 12 (Del. Feb. 16, 2000) (TABLE).

18. *Trump,* 753 A.2d at 967 (quoting Robert W. Clifford, *Identifying and Preventing Improper Prosecutorial Comment in Closing Argument,* 51 Me. L.Rev. 241, 247 (1999)).

19. Del. Const. art. I, § 7.

20. The asserted excerpts of the prosecutor's closing argument have been numbered by this Court for convenience of analysis. Further, emphasis has been added to highlight the use of the words "right" and "correct."

the end of this trial, is what the evidence tells you and it's what the evidence tells you beyond a reasonable doubt. The evidence tells us a story, mostly coming from Namil Owens, Mia Biddle, and Cammellia Stewart, supported by the little evidence that the police were able to recover, the testimony of the medical examiner, and the damage to the black Saturn.

. . . .

2) Ladies and gentlemen, Mia Biddle was *right*. Snizz is Jasmine Stewart's boyfriend and best friend. And that's Snizz. That's what the evidence shows you. The evidence is clear that Mia Biddle knew who Snizz was. She didn't know his real name, but she put that name, Snizz, with that face. And that's what the evidence tells us. And that's why she was *right* when she told you that when she pulled up into the three-hundred block of Townsend Street, she saw Snizz standing out there.

. . . .

3) So, Mia Biddle was *right*. She told you that the defendant had an injury to his leg; he sure did. The evidence tells you that.

. . . .

4) This is one of the pictures that's in evidence, that you will have a chance to see, and you will notice, of course that at the top of the frame there is a street-light, and you will remember Detective Flaherty's testimony that he was standing basically in front of 328 Townsend Street looking south when he took the photograph. 328 is out of view of this photograph, to the left. What does that mean? It means that if you're in a car in front of 328 Townsend Street, and you're looking behind your car . . . you will see that streetlight. And so, when Mia Biddle tells you the person was standing under a street light, it means

she is *right*. It means that the gunman was behind her car. And so, she was *absolutely right* about that. But that's not the only evidence that tells you Mia Biddle's initial observation about where the defendant was standing when he started shooting are *correct.*

. . . .

5) One other piece of evidence that tells you she is *right,* the location of the wound, the bullet wound that took Donald Williams life.

. . . .

6) Folks, the evidence shows us beyond a reasonable doubt that what Mia Biddle told you is *exactly right*. It was the defendant firing a gun and it was the defendant who caused the death of Donald Williams.

. . . .

7) Cammellia Stewart was *right,* too. Her story of the night of August 2nd is very similar to what you heard from Namil Owens and Mia Biddle, at least by the end it was.

. . . .

8) Ladies and gentlemen, Cammellia Stewart was *right*. That's Snizz, and she knew him.

. . . .

9) And when she asked him what the trouble was, he told her that he had just gotten a new tattoo. Of course, we later learned it wasn't a tattoo, it was a burn from an ATV. But Cammellia Stewart was *right* when she told Detective Flaherty that the defendant had had an injury to his leg, she was *exactly right* about that.

. . . .

10) And here's what you know: Mia Biddle was *right,* it was the defendant who was in the 300 block of Townsend Street, just after 11:30 PM, firing a gun at the black Saturn Donald Williams was

riding in. Cammellia Stewart was *right*. It was Snizz out there, with a bandage on his left leg, firing the gun at Namil Owens' black Saturn. And Namil Owens was *right*. The guy he tried to buy weed from just a few minutes before the bullets started to fly was the defendant. That's what the evidence tells us. And because Mia Biddle was *right,* and because Cammellia Stewart was *right,* and because Namil Owens was *right,* folks, there's only *one right verdict* in this case, and that verdict is guilty.

■ The prosecutor in this case undoubtedly improperly vouched for the credibility of certain witnesses when he repeatedly asserted that various key witnesses were "right." The prosecutor's conclusions that Biddle, Stewart, and Owens were "right" went beyond what could be logically inferred from the trial evidence. Although a more complete discussion of the prosecutor's improper vouching is fleshed out below, we first analyze the merits of the State's argument that the prosecutor's statements did not amount to improper vouching.

The State argues that the prosecutor drew reasonable inferences supported by the evidence every time he concluded that a witness was "right." The State further argues that, read in the context of the entire closing argument, the excerpts reveal that they are unmistakably tied to witnesses' statements and the other evidence presented. The State's argument cannot be accepted for several reasons.

First, this Court has repeatedly cautioned against the use of the word "lie" by prosecutors to describe witness testimony, because "the prosecutor who labels testimony as a lie runs the risk of passing from a legitimate inference drawn from the evidence ... to the expression of an impermissible personal opinion." [21] The word lie "is a flashboard more likely to create heat in a contentious courtroom than it is to illuminate the search for truth." [22] Here, we deal with the flip side of the same coin when reviewing the prosecutor's repeated use of the word "right."

The characterization of testimony as "right," even when couched with modifiers such as "the evidence shows" or "the evidence tells us," necessarily says that a witness' testimony "conform[s] to facts or truth, [*i.e.,* that it is] correct." [23] Thus, when a prosecutor states that a witness is "right," he is saying that the witness' testimony agrees with the facts of the case—and at trial, these facts are developed by the record evidence. Any broader implications drawn from characterizing a witness' testimony as "right"—beyond those implications that can be logically inferred from the record evidence—more closely resemble impermissible personal opinions of the prosecutor.[24] To reiterate, a jury is likely to give "special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding presumably available to the office." [25] That observation highlights the extreme risk prosecutors take when referring to witnesses' testimony in absolute terms, such as "right" or "correct."

Here, testimony from Biddle, Stewart, and Owens comprised the majority of the

---

21. *Hughes v. State,* 437 A.2d 559, 571 (Del. 1981).

22. *Id.*

23. *Merriam Webster's Collegiate Dictionary* 1008 (10th ed.1993).

24. *Hughes,* 437 A.2d at 571.

25. Am. Bar. Ass'n, *Standards for Criminal Justice* 3–5.8 (1993).

State's record evidence. The prosecutor did at times attempt to link his conclusions that the witnesses were "right" to the record evidence, but he did so in the face of contradictions and other inconsistencies in the evidence that would undermine his conclusion that a specific witness was "right."

For example, the prosecutor in Excerpt 10 stated that "Stewart was *right*. It was Snizz out there ... firing the gun at Namil Owens' black Saturn.... That's what the evidence tells us." This assertion amounts to stating that Stewart's testimony agrees with the facts developed by the record evidence. Yet, Stewart admitted in her cross-examination that she did not see Whittle shooting, or even carrying, a gun. In fact, only Biddle's testimony pegged Whittle as the shooter. It is a far stretch for the prosecutor to conclude that Stewart was "right" about Whittle firing a gun when only one out of three key witnesses claimed to have seen the shooting. Although a prosecutor is not normally required to bring up every damning piece of evidence in his closing argument, where the prosecutor says that Stewart was "right," that requires us to verify that the evidence *actually* shows that this statement was accurate. And where, as here, there was significant contradictory evidence against, and little supporting evidence for, that characterization, the prosecutor's statement implied conclusions beyond those that could logically be inferred from the record evidence. That alone amounted to improper vouching.

Another example of improper vouching is found in Excerpt 7 where the prosecutor states, "Cammellia Stewart was *right* too. Her story of the night of August 2nd is very *similar* to what you heard from Namil Owens and Mia Biddle, at least by the end it was." In this example, the prosecutor claimed an absolute truth—that Stew-

art was "right"—while also explicitly stating that her testimony was only "very similar" to Owens and Biddle's testimony. The prosecutor then further discounted the alleged correctness of Stewart's testimony, by acknowledging that that testimony only became "similar" to Owens and Biddle's testimony "by the end [of trial]." The phrase "very similar" is not synonymous with "right." By using that phrase, the prosecutor inferred more than could have been logically deduced from the evidence by equating the two.

Because the above examples are typical of much of the characterizations found in the remaining excerpts, we need not analyze in detail every specific instance of improper vouching. Even so, we must analyze the excerpts in the context of the closing argument as a whole. That analysis discloses a broader, overarching theme of improper vouching that permeated the prosecutor's entire closing argument.

Quite often the prosecutor would state that the witnesses were "right" about relatively trivial issues that did not have probative value of the various crimes for which Whittle was charged. For example, the prosecutor claimed that Owens was "right" when he testified that he unsuccessfully attempted to buy marijuana from Whittle, and that Biddle was "right" when she testified that Whittle had a burn on his leg. Despite the limited relevance these details may have actually had as proof that Whittle was the shooter, the prosecutor gave his argument more rhetorical force by repeatedly stating that the three key witnesses were "right."

Most disturbing was the prosecutor's strategy of continuously vouching for the truthfulness of Biddle, Stewart, and Owens' testimony as a platform from which to make the leap to the most central issue of all—whether Whittle shot and murdered

Williams. At the end of his closing argument, in Excerpt 10, the prosecutor stated:

> And because Mia Biddle was *right,* and because Cammellia Stewart was *right,* and because Namil Owens was *right,* folks there's only *one right verdict* in this case, and that verdict is guilty.

By impermissibly implying that three key witnesses were "right" about more marginal issues at trial, the prosecutor manufactured sufficient credibility to claim that there was a "right" outcome to the case. The above-quoted example proved to be the most egregious instance of improper vouching because the statement's foundation rested entirely on the impermissible inferences that the prosecutor himself had created. The prosecutor's continuous vouching helped to create an aura of credibility surrounding the witnesses, from which it became easier for the prosecutor to argue Whittle's guilt to the jury. The asserted excerpts, when read in the context of the entire closing argument, solidify our conclusion that the prosecutor improperly vouched for the credibility of these three witnesses.

### C. Did the Prosecutor's Improper Vouching Constitute Plain Error?

■■■ Whittle's counsel did not object to the prosecutor's conduct at trial, and the trial judge did not intervene to correct it *sua sponte.*[26] Therefore, this Court will overturn Whittle's conviction only if the prosecutor's improper vouching amounted to plain error. Under *Wainwright,* this Court finds plain error only for "material defects which are apparent on the face of record[,] which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which show manifest injustice."[27]

This Court has indicated that plain error is more likely to be found in the improper vouching context where witness credibility is central in a "close case," and where the error is so egregious that the trial judge should have intervened *sua sponte* to correct it.[28] Although relevant, these factors are not essential for this Court to find plain error.[29] In *Baker v. State,* we emphasized that the fundamental question is whether the *Wainwright* standard is satisfied.[30] Nevertheless, whether a close case turns on the credibility of witnesses is an important consideration.

Plain error is present in this case. There was little physical evidence to support Whittle's conviction. Although the State's ballistic evidence showed that three of the four recovered bullets were fired from the same gun, the State never introduced a gun into evidence. Although a bullet trajectory analysis indicated that the shooter must have been standing behind

---

26. The trial judge appeared to have had some concern about the prosecutor's closing argument. After the prosecutor's closing argument, the trial judge summarily repeated a portion of the general jury instructions that had been given prior to closing arguments. The trial judge reminded the jury that "what attorneys personally think or believe about the truth or falsity of witnesses' testimony, or about the guilt or innocence of an accused is not relevant." However, we find that repeating portions of general jury instructions was not enough to constitute a *sua sponte* intervention that would have corrected the prosecutor's improper vouching.

27. *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986).

28. *Clayton v. State,* 765 A.2d 940, 944 (Del. 2001).

29. *Baker v. State,* 906 A.2d 139, 150–51 (Del. 2006).

30. *Id.* at 151 ("[W]e think it prudent to abandon the *sua sponte* intervention standard entirely in favor of the *Wainwright* standard.").

Owens' car, there was uncertainty among the witnesses about whether the shots were fired from the passenger side of the car or the back of the car, and whether or not there were multiple shooters. None of this evidence directly linked Whittle to shooting Williams.

With little physical evidence, witness credibility played a central role in what was a close case. The jury could only find Whittle guilty if it believed the testimony of the State's three key witnesses. The State's case was relatively thin because only one witness, Biddle, actually saw Whittle carry or shoot a gun. Because the closeness of the case was so intimately linked to the witnesses' credibility, it was crucial for the jury to decide independently how to weigh the witnesses' testimony. The prosecutor's improper vouching undermined the jury's ability to do that "because jurors may easily interpret vouching by the prosecutor as an official endorsement of the witness and in doing so, overlook important aspects of the witness's credibility." [31] Given the prosecutor's special role in the judicial system, he should have been "especially careful to let the evidence speak for itself." [32] Instead, the prosecutor repeatedly vouched for the witnesses' credibility by characterizing their testimony in absolute terms, such as "right" and "correct." And, the prosecutor did that in the face of other contradictory and inconsistent testimony evidence. As a result, the prosecutor's improper

vouching was so fundamental and serious that it deprived Whittle of his right to a fair trial.

## IV. CONCLUSION

We find that the prosecutor erred by improperly vouching for Biddle, Stewart, and Owens, whose testimony constituted the decisive evidence in this case. This vouching amounted to plain error under *Wainwright*.[33] We therefore REVERSE the judgment of the Superior Court and REMAND for a new trial.

31. *Trump v. State*, 753 A.2d 963, 967 (Del. 2000).

32. *Id.* at 969.

33. After finding plain error under *Wainwright*, it is unnecessary to reach analysis under *Hunter v. State*. However, this Court advises practitioners that the conduct in this case was likely serious enough to warrant reversal under *Hunter* had we reached that final step. Here, the prosecutorial vouching

was so repetitive, combined with the fact that this Court has often addressed improper vouching in its case law, that doubt was likely cast upon the integrity of the judicial system. We provide this final thought as a caution for practitioners. "Prosecutors must resist the urge to win at all costs and instead must be especially careful to let the evidence speak for itself and to choose their words in a closing argument with great care." *Trump*, 753 A.2d at 969 (internal quotations omitted).