# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DARTH HEALD, | § | |
| | § | No. 108, 2020 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No. 1901004218(N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: February 10, 2021
Decided: April 27, 2021

Before **VALIHURA**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED**.

Nicole M. Walker, Esquire, OFFICE OF PUBLIC DEFENDER, Wilmington, Delaware, *for Appellant Darth Heald*.

Kathryn J. Garrison, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Dover, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

A Superior Court jury found Darth Heald guilty of unlawful sexual contact with a nine-year-old child and related charges. The alleged contact occurred when Heald brushed the back of his hand over the child's clothed "private parts" during a "tag"-like game in which the player who is "it" chases the other players, who, if caught, are tickled rather than tagged. The prosecution's case was centered more on what the child had reported to others than what she said on the witness stand. By contrast, the defense focused on testimony from other children who were present or nearby at the time of the alleged offense—accounts that contradicted the complainant's version of important facts—and Heald's testimony denying the essential elements of the charged offenses. It was, by any reasonable estimation, a case that could have gone either way.

This appeal addresses the Superior Court's admission of evidence throughout the trial, sometimes over Heald's objections and sometimes in the absence of any objection. In the main, we find no reversible error in the court's evidentiary rulings. But we also must address Heald's claim that improper comments in the prosecution's opening statement and again in its closing argument cast doubt on the fairness and integrity of his trial. Because none of the challenged comments drew an objection from the defense, we are limited to reviewing them for plain error—that is, error that is "so clearly prejudicial to substantial rights as to jeopardize the fairness and

integrity of the trial process."[1]  Even so, we have determined that several of the prosecutor's comments were improper and that their cumulative effect compromised the fairness of Heald's trial.  Consequently, we reverse and remand for a new trial.

## I.      FACTUAL BACKGROUND

On September 9, 2018,[2] nine-year-old Ann[3] spent the afternoon playing at her neighbors' home with ten-year-old Ashley Heald and eight-year-old Brian Heald.  Another friend from the neighborhood, Carl, also joined the children to play at the Healds' home.  In the late afternoon, Darth Heald, Ashley's and Brian's uncle, who lived part time with the Healds, joined the four children in a family game called "Monster," which combines the rules of tag and hide-and-seek.  During the game, the player designated "it" would look for and chase the others and, upon catching the hiding players, would tickle them.  Shortly after the game started, Ann unexpectedly left the Healds' home and returned to her house.  Upon arriving home, Ann appeared upset and told her father that her friend's uncle had touched her inappropriately.

---

[1] *Whittle v. State*, 77 A.3d 239, 243 (Del. 2013) (quoting *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).

[2] Both the arrest warrant and the indictment alleged that the offenses were committed "on or about the 10th day of September, 2018."  App. to Opening Br. at A8–10.  The testimony at trial, however, seems to indicate that the relevant date was Sunday, September 9, which was also the date the Superior Court used when instructing the jury.

[3] This opinion uses the pseudonyms the parties assigned to the complainant and all juvenile witnesses.

Heald was indicted on charges of sexual abuse of a child by a person in a position of trust, authority, or supervision in the second degree; dangerous crime against a child; unlawful sexual contact in the first degree; and unlawful imprisonment in the second degree. At Heald's trial, witness testimony conflicted regarding the events that occurred during the game of Monster at the Healds' home on September 9.

Ann—now ten years old—testified at trial a year, almost to the day, after the incident giving rise to the charges against Heald. She could not remember why she went to the Healds' home that day or how long she was there. She did, however, recall playing Monster with Ashley, Brian, Carl, and Heald. Ann testified that Heald tickled her on her stomach, and he also tickled Brian while the two kids were in Ashley's room during the game. At this point, Ann's testimony took an interesting turn. Instead of asking Ann what, if anything, happened next, the prosecutor sought to elicit Ann's recollection of her interview a month later at the Child Advocacy Center (the "CAC"), ostensibly so that the State could play the recording of that interview for the jury under 11 *Del. C.* § 3507.[4] But Ann was unable to recall whether anyone forced her to participate in the interview or what she was "telling

---

[4] 11 *Del. C.* § 3507 ("In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.").

4

[the interviewer] about."[5] This last memory lapse caused the prosecutor to ask the court if she might "approach the witness to possibly refresh her recollection about why she was at the Child Advocacy Center."[6] Having received the court's permission, the prosecutor showed Ann something—the record does not tell us what it was—and Ann confirmed that what was shown to her helped her "remember a little bit about being there at the Child Advocacy Center."[7] The prosecutor then led her into acknowledging that the interview "involve[d] being over at the Heald's [sic] house" and also "involve[d] the uncle, Darth."[8] This acknowledgment was followed immediately by the following exchange:

Q: And when Uncle Darth played those games with you and the other children, did he touch you at any point?
A: Yes.
Q: Where did he touch you?
A: On my private parts.[9]

This exchange represents the sum total of Ann's testimony regarding Heald's unlawful sexual contact with her. We pause here to observe that the damaging exchange quoted above occurred almost immediately after Ann's recollection was refreshed—purportedly for another purpose—by an unidentified object.

---

[5] App. to Opening Br. at A41.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*

To fill in the gaps in Ann's testimony, the State introduced Ann's CAC interview. The State called Amy Kendall, the forensic investigator who had interviewed Ann, to authenticate the statement under 11 *Del. C.* § 3507.[10] Kendall explained her training, experience, and the CAC's process for conducting interviews of children. The recorded interview was then admitted, without objection, and played for the jury.

During Ann's CAC interview, Ann told Kendall that she was playing hide and seek at the Healds' home with Ashley, Brian, Carl, and Heald. Ann explained that Brian and she were hiding in Ashley's room with the door locked when Heald unlocked the door and came into the room. Upon entering the room, Heald tickled Brian and Ann on their stomachs, backs, and armpits. According to Ann, when Heald opened a window in the bedroom, Brian ran out of the room. Ann said that she also tried to leave the room, but Heald was standing in the doorway, blocking the way out. Ann stated that she then laid on Ashley's bed and Heald came over to the bed and touched her. Ann explained that Heald touched her stomach with the backside of his hand and then moved his hand down over her pants and touched her private area. All of this contact was over Ann's clothing. Ann also told Kendall that she could smell alcohol on Heald's breath. Heald then asked if she wanted to be his partner and search for the other kids together. Ann agreed and went downstairs with

---

[10] *See supra* note 4.

Heald, continuing with the game. Ann stated that she felt uncomfortable, so she called her dad and asked what time she needed to come home. She then told the others she needed to leave and ran home.

The State also called Ashley and Brian Heald as witnesses. Ashley recalled playing Monster with Brian, Carl, Ann, and Heald. She remembered that Heald was the monster and that he would chase the children from her bedroom on the second floor of the house to the bathroom in the basement. Ashley testified that, during the game, Heald had started to tickle Ann but stopped when Ann asked him to. Ashley also testified that Ann was never in her room alone with Heald and that, while everyone was in her room being tickled by Heald, Ann went downstairs to the kitchen to get a drink. When asked why Ann unexpectedly left the Healds' house that day, Ashley recalled that she "just thought she had to go . . . . I thought her mom texted her. Maybe she had to go somewhere or just do something."[11]

Brian also testified that the four kids were playing Monster with Heald. Brian explained that all four children were in Ashley's bedroom playing a computer game when Heald came in and started tickling all the children. Like Ashley, Brian said that Ann was never alone with Heald. Brian stated that, while the other kids continued playing the game with Heald in the basement, Ann stayed in the living room on the first floor of the house. According to Brian, Ann left the Healds' house

---

[11] App. to Opening Br. at A29.

five or ten minutes after she told the other kids that she was uncomfortable being at the house.

The State also called Ann's mother and father as witnesses to describe what happened after Ann returned home from the Healds' house. When asked about Ann's demeanor when she came home, Ann's father, Ryan Smith, testified that "[s]he was extremely upset"[12] and that he had "never seen her act like that before. Crying. Just very scared. Just very upset."[13] He thought "something really bad had happened . . . [and that he was] trying to calm her down."[14] After he was able to calm Ann down, she told him that "[t]he uncle, the friend's uncle"[15] had "touched her inappropriately."[16] He encouraged Ann to talk with her grandmother because he thought that Ann would not tell him more details about what had happened or where she was touched. Smith explained that he did not call the police "because [he] wanted to talk it over with her mother . . . [and] get more information."[17]

Ann's mother, Samantha Houghton, testified that she was still at work when she received a call from her mother—Ann's grandmother—about what had happened to Ann. Houghton testified that she was not able to get a lot of details from Ann over the phone about what happened because she thought Ann "was kind

---

[12] *Id.* at A20.
[13] *Id.*
[14] *Id.*
[15] *Id.* at A22.
[16] *Id.* at A21.
[17] *Id.* at A22.

8

of embarrassed."[18] Houghton called the state police on her way home from work to inquire about what steps she should take. When asked about Ann's demeanor when she arrived home from work, Houghton testified that "you could tell that she had been very upset, that she was crying for a while. Her eyes were red and puffy. She wouldn't look me in the face when she was talking to me. She kept her head down. Just very nervous."[19] Houghton explained that getting Ann to share the details about what happened "was kind of like unravelling a[n] onion a little bit at a time. Little questions at a time."[20] Houghton also said that she did not call the police after talking with Ann because she "didn't want to frighten her by having people come over to [the] house."[21] Houghton testified that after she talked with Ann, instead of calling the police, she scheduled an appointment for Ann to see her counselor, who Ann saw for her school-related anxiety. Houghton stated that after Ann's appointment, the counselor reported the incident to law enforcement.

After the Superior Court engaged in a colloquy with Heald to ensure that his decision to testify in his own defense was made knowingly, intelligently, and voluntarily, Heald took the stand. He testified that, on the day in question, as the other witnesses had explained, he was playing Monster with Ashley, Brian, Carl,

---

[18] *Id.* at A18.
[19] *Id.* at A19.
[20] *Id.*
[21] *Id.*

9

and Ann. Heald recalled that at first Ann was shy and unsure about being tickled, but after Brian explained the game to her, she said that she wanted to play. Heald related that after he tickled all four children in Ashley's room, everyone left Ashley's room and went downstairs. He chased Ashley, Brian, and Carl to the bathroom in the basement, while Ann stayed in the kitchen on the first floor of the house. Heald denied ever being alone with Ann and denied touching her in a sexual manner.

Heald was convicted on all charges and sentenced to 13 years Level V incarceration suspended after two years for decreasing levels of supervision. This appeal followed.

## II. ANALYSIS

Heald raises a host of evidentiary issues relating to the Superior Court's admission—in some instances over his objections, in another without objection from him—of Ann's parents' testimony. He also contends that the court plainly erred by allowing the forensic interviewer (Kendall) to testify about her training and experience in child-interview techniques and to explain the CAC interview process. But the claim upon which the resolution of this appeal hinges, in our view, is Heald's prosecutorial misconduct claim. Heald points to a series of comments the prosecutor made during her opening statement and closing argument, which he claims "directly and indirectly vouched and elicited sympathy for [Ann][,] were improper[,] and

jeopardized the fairness and integrity of [his] trial."[22]  Because we agree with Heald's

characterization of the impact of the prosecutor's comments on his trial, we begin

our analysis there.

### A.      Prosecutorial Misconduct

Heald argues that the prosecutor made several comments during her opening

statement and closing argument that impermissibly vouched for Ann's credibility

and undermined the fairness and integrity of his trial.  Because Heald did not object

to the prosecutor's statements, we review for plain error.[23]

Under plain error review, we first conduct a *de novo* review of the record to

determine whether prosecutorial misconduct occurred.[24]  If we determine that the

prosecutor's actions rise to the level of misconduct, we must reverse if the error

complained of is "so clearly prejudicial to substantial rights as to jeopardize the

fairness and integrity of the trial process."[25]   When more than one statement

amounting to misconduct is involved, "our analysis includes a review of both the

statements' individual and cumulative effect."[26]

Our review also takes into account the influential role a prosecutor plays "in

the criminal justice system because they have the dual obligations of presenting the

---

[22] Opening Br. at 23.

[23] *Green v. State*, 147 A.3d 748, 2016 WL 4699156, at * 2 (Del. Sept. 7, 2016) (TABLE).

[24] *Whittle*, 77 A.3d at 243 (citing *Baker v. State*, 906 A.2d 139, 150 (Del. 2006)).

[25] *Id.* (quoting *Wainright*, 504 A.2d at 1100).

[26] *Baker*, 906 A.2d at 151 n.22 (Del. 2006) (quoting *Swan v. State*, 820 A.2d 342, 356 (Del. 2003)).

11

State's case with earnestness and vigor and the equal duty to see that justice be done by giving [the] defendant a fair and impartial trial."[27] This Court has recognized the potential that jurors "'will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office.'"[28] Improper vouching is "especially problematic when a witness'[s] credibility is at issue 'because jurors may easily interpret vouching by the prosecutor as an official endorsement of the witness.'"[29] Thus, "[t]he prosecutor has the responsibility to 'ensure that guilt is decided only on the basis of sufficient evidence,' without the undue influence of 'improper suggestions, insinuations, and assertions of personal knowledge.'"[30]

Against this backdrop, we turn to the prosecutor's statements that Heald challenges on appeal. Heald first challenges the prosecutor's statements during her opening statement that Ann would appear nervous during trial and that she was a "nervous Nellie" and "had some anxiety issues."[31] Heald contends that the prosecutor also inappropriately discussed the reliability of statements made during Ann's CAC interview. According to Heald, the prosecutor improperly urged the

---

[27] *Whittle*, 77 A.3d at 244 (internal quotations omitted).
[28] *Id.* (quoting Am. Bar. Ass'n, *Standards for Criminal Justice* 3–5.8 (1993)).
[29] *Id.* (quoting *Trump v. State*, 753 A.2d 963, 967 (Del.2000)).
[30] *Rasin v. State*, 187 A.3d 1209, 2018 WL 2355941, at *2 (Del. May 23, 2018) (TABLE) (quoting *Kirkley v. State*, 41 A.3d 372, 377 (Del. 2012)).
[31] App. to Opening Br. at A15.

jury to give more weight to Ann's CAC interview by stating "[s]o the good thing in this case is as nervous as [Ann] may be, there is that recorded statement."[32] Heald argues that these statements improperly bolstered Ann's credibility during the CAC interview.

Taken alone, we find that the prosecutor's statements about Ann's nervous demeanor and the CAC interview do not rise to the level of misconduct. The statements do not misstate evidence, nor do they express or imply that the prosecutor has personal knowledge about the truth of Ann's testimony. Moreover, as the State points out, the statements were supported by the testimony of Ann's mother,[33] and the jury was able to see for themselves that Ann had a nervous demeanor.

Heald next points to opinions expressed by the prosecutor during her closing argument that suggested that Ann and her parents had done the right thing and that the "system worked":

> [*Ann*] *did everything right*. She got the touch. She knew it wasn't right. She got out of there. And she told her parents, and she told her therapist. And to judge her parents, everybody responds to trauma differently, *and her parents did the right thing*. They reached the therapist because their priority was not law enforcement, was not reporting a crime, not the defendant. In that moment their priority was their daughter, and they took care of their daughter. *And the system actually worked. It got reported through the therapist. And when it got reported, the system worked*, the interview at the Child Advocacy Center.[34]

---

[32] *Id.*

[33] At trial, Ann's mother explained that Ann had been regularly seeing a counselor for school-related anxiety.

[34] App. to Opening Br. at A57 (emphasis added).

Heald acknowledges that the prosecutor could properly address the "sequence of events provided by Ann and the reasons provided by the parents for the choices they made in reporting Ann's allegation."[35] Heald also notes that the prosecutor was entitled to argue all reasonable inferences from the evidence presented at trial. But Heald contends that these statements were improper bolstering because the statements revealed the prosecutor's personal opinions and suggested that "the choices the witnesses made were 'right' and that as a result of those choices, 'the system worked' and the right person was brought to trial."[36]

For its part, the State contends that the prosecutor's statements were intended to rebut Heald's counsel's argument during closing that "Ann's version of events was not credible because her family did not immediately report the incident."[37] The State argues that the prosecutor's statements did not amount to improper vouching because they "'simply provided facts from the record showing why the witnesses should be believed.'"[38]

We have previously cautioned against the prosecution's use of the word "right" when describing a witness's testimony during trial. In *Whittle v. State*, we found that the prosecutor improperly vouched for the witnesses' credibility by

---

[35] Opening Br. at 29.
[36] *Id.* (internal footnotes omitted).
[37] Answering Br. at 27.
[38] *Id.* at 28 (quoting *Raisin*, 2018 WL 2355941, at *3).

stating that "they were 'right' or 'correct' at least 20 times."[39]  Although the prosecutor here used the word "right" when referring to the actions that Ann and her parents took and not the testimony that Ann and her parents offered at trial, the danger created by using the word "right" remains the same; they express the prosecutor's favorable opinion of the witnesses' conduct during the events that led to Heald's arrest and prosecution.  And the prosecutor's opinions, though—and perhaps because—they carry "the authority and respect the office of the prosecutor commands,"[40] are irrelevant.  As such, these statements were improper.

The impropriety of the prosecutor's commendation of Ann and her parents for doing "the right thing" was aggravated by her related comment that, in the event— that is, when Ann's therapist reported the alleged assault to law enforcement—"the system worked."  Although the State paints this comment as an innocuous statement that Ann's allegations were reported through a functioning system, from the therapist to law enforcement, we see it differently.  This statement could all too easily be interpreted as the prosecutor's vouching for the justness of Heald's arrest and prosecution.  After all, the "system's" response to the therapist's report was the arrest, indictment, and the trial currently under review.  Indeed, it is difficult to see it any other way than this: when the alleged assault "got reported through the

---

[39] *Whittle*, 77 A.3d at 241.
[40] *Trala v. State*, 244 A.3d 989, 1000 (Del. 2020).

therapist [to law enforcement], . . . the system [actually] worked"[41] by securing Heald's arrest and pursuing his prosecution. This, to us, is improper vouching for the prosecution's case.[42]

Heald challenges numerous other statements made by the prosecutor during closing argument. Heald contends that the prosecutor impermissibly invoked the sympathy of the jury by commenting on the effect of the case and trial on Ann. Specifically, in her closing argument, the prosecutor remarked that: "[i]t looked like this was probably one of the more painful things this ten-year-old had ever had to have done in her life."[43] Heald also asserts that the prosecutor improperly suggested to the jury that Ann told a number of adults "the same thing"[44] about what happened at the Healds' home. Heald also argues that, during closing argument, the prosecutor "inflamed the passions of the jury against Heald through an improper characterization of his charges"[45] by commenting:

> Let's face it. When it comes to family members, no one wants to think or believe that a family member could ever do something as heinous as what we are alleging here. It's something that family may choose to never believe it ever happened, unless they saw it with their own eyes.[46]

---

[41] App. to Opening Br. at A57.

[42] *Kirkley*, 41 A.3d at 377 ("[T]he prosecutor commits misconduct when he vouches for the State's case." (quoting *Hardy v. State*, 962 A.2d 244, 247 (Del. 2008))); *see* Del. R. Prof. Conduct 3.4(e) (2021) ("A lawyer shall not . . . in trial, state a personal opinion as to the justness of a cause, the credibility of a witness, [or] . . . the guilt of an accused.").

[43] App. to Opening Br. at A56.

[44] *Id.* at A57.

[45] Opening Br. at 32.

[46] App. to Opening Br. at A56.

These statements, too, were improper. We have recognized that the State has "flexibility in closing arguments that allows attorneys to move beyond the bounds of merely regurgitating evidence and allows attorneys to explain all legitimate inferences of innocence or guilt that flow[] from the evidence presented at trial."[47] But this flexibility is limited. A prosecutor may not express her personal opinions and must avoid "improper suggestions, insinuations, and assertions of personal knowledge in order to ensure that guilt is decided only on the bases of sufficient evidence."[48] Here, the prosecutor opined that "no one wants to think or believe that a family member could ever do something"[49] like the allegations facing Heald here. The prosecutor described these allegations as "heinous."[50] Moreover, the prosecutor told the jury that Ann's statements to multiple "trusted adults" were "the same,"[51] implying that the prosecutor knew more about the content of the statements Ann made to each of the adults with whom she talked about the incident than the evidence suggested. These statements go beyond the inferences that a prosecutor may argue based on the evidence presented at trial.

Having determined that the prosecutor engaged in misconduct, we must next determine whether those statements prejudicially affected Heald's substantial rights.

---

[47] *Burroughs v. State*, 988 A.2d 445, 449 (Del. 2010).
[48] *Kirkley*, 41 A.3d at 377 (citing *Trump*, 753 A.2d at 968).
[49] App. to Opening Br. at A56.
[50] *Id.*
[51] *Id.* at A57.

17

We must assess whether the prosecutor's statements, reviewed cumulatively[52] and in the context of the whole case, prejudiced the defendant's right to a fair trial.[53] Where the credibility of witnesses is a central issue in the case, the closeness of the case is an important consideration.[54]

Here, the case was close, and the credibility of the witnesses was central to the jury's task. The many witnesses called by the State, including Ann, recounted the events that occurred at the Healds' house differently. For example, Ann testified that Brian and she were alone in Ashley's room—without Ashley and Carl—and that Heald touched her after Brian had run out of the room. But Ashley and Brian recalled that all four children were in Ashley's room during the game. Moreover, Ashley, Brian, and Heald all testified that Ann was never alone with Heald in any room of the house. Ann's testimony itself was beset by faded memory and uncertainty. And her only testimony that directly incriminated Heald appears to have depended on a recollection refreshed by her review of an unidentified object during her direct examination by the State. Heald took the stand in his own defense and denied touching Ann inappropriately. Moreover, there was no physical evidence presented by either party. In a case such as this one, where the margin between guilt and innocence is narrow, we cannot be confident that the prosecutor's improper

---

[52] *Swan*, 820 A.2d at 356.
[53] *Hooks v. State*, 416 A.2d 189, 205 (Del. 1980).
[54] *Whittle*, 77 A.3d at 248.

18

comments did not have a measurable cumulative effect on the jury's verdict. We therefore conclude that the prosecutor's improper comments as identified and discussed above jeopardized the fairness and integrity of Heald's trial.

Because our reversal on this ground results in a remand for a new trial, we next turn our attention to Heald's claims that the Superior Court erred by allowing the State to introduce inadmissible hearsay and other prejudicial testimony.

## B. Testimony of Ann's Parents

Heald challenges the admission of three parts of Ann's parents' testimony: (1) Ann's parents' statements about Ann's demeanor when she returned home following her encounter with Heald; (2) Ann's parents' statements about the other people Ann talked to about the incident; and (3) Ann's father's statement that Ann had told him that her friend's uncle had touched her inappropriately.

At trial, Heald objected to the admission of the statements regarding the other people Ann talked to about the incident and the admission of Ann's hearsay statement to her father. Here, Heald argues that these statements served no proper purpose and were "unfairly prejudicial to Heald as [the statements] improperly bolstered Ann's claim and improperly elicited sympathy for her."[55] Heald did not object to the admission of Ann's parents' statements about Ann's demeanor at trial, but now argues that these statements, along with other statements made by Ann's

---

[55] Opening Br. at 9.

parents, should not have been admitted at trial because they were irrelevant and unfairly prejudicial.

The State responds that Ann's parents' testimony about Ann's demeanor and the other people Ann talked to about the incident were properly admitted as relevant evidence and did not improperly bolster or vouch for the Ann's credibility. The State contends that these statements explain "how the investigation unfolded"[56] and that "none of the people with whom Ann spoke testified to the details of what she told them, nor did they comment, either explicitly or implicitly, about whether they believed she was telling the truth."[57] And the State argues that the Superior Court properly admitted Ann's hearsay statement that her friend's uncle touched her inappropriately as an excited utterance.

Whether the defendant objected to the admission of evidence at trial dictates the standard of review under which we review the trial court's evidentiary rulings. This Court reviews the trial court's rulings on the admissibility of evidence for abuse of discretion.[58] "An abuse of discretion occurs when a court has exceeded the bounds of reason in light of the circumstances, or so ignored recognized rules of law or practice so as to produce injustice."[59] In the absence of an objection at trial, this

---

[56] Answering Br. at 12.
[57] *Id.*
[58] *McNair v. State*, 990 A.2d 398, 401 (Del. 2010) (citing *Baumann v. State*, 891 A.2d 146, 148 (Del. 2005)).
[59] *Id.* (citing *Lilly v. State*, 649 A.2d 1055, 1059 (Del. 1994)).

Court reviews the trial court's evidentiary rulings for plain error.[60] "Plain errors are 'limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.'"[61]

### 1. Ann's Demeanor

Because he did not object at trial, we review Heald's contention that Ann's parents' testimony regarding Ann's demeanor after the alleged incident at the Healds' house served no proper purpose and had a prejudicial effect that outweighed its probative value for plain error. At trial, Ann's parents testified that Ann was "extremely upset . . . [and] very scared,"[62] that "she was kind of embarrassed,"[63] and that "[s]he kept her head down . . . [and was] [j]ust very nervous."[64] In our view, contrary to Heald's contention, these statements are relevant and provide context for understanding Ann's version of the events that occurred at the Healds' home during the game of Monster. We note that "[a]s a general rule, a witness may not bolster or vouch for the credibility of another witness by testifying that the other witness is telling the truth."[65] But the parents' description of Ann's emotional state after she returned home from the Healds' house cannot fairly be likened to testimony that this

---

[60] *Green*, 2016 WL 4699156, at *2 (citing Supr. Ct. R. 8 and *Wainright*, 504 A.2d at 1100).
[61] *Id.* (quoting *Wainright*, 504 A.2d at 1100).
[62] App. to Opening Br. at A20.
[63] *Id.* at A18.
[64] *Id.* at A19.
[65] *Capano v. State*, 781 A.2d 556, 595 (Del. 2001).

Court has previously prohibited as improper vouching or bolstering.[66]  Here, the parents' testified about their observations of Ann's demeanor after the alleged incident without commenting on Ann's credibility or the truthfulness or reliability of her statements.  Accordingly, we find no error in the Superior Court's admission of this testimony.

### 2.  *Ann's Statements to Other People*

We also find no abuse of discretion in the Superior Court's admission of the parents' testimony that Ann had talked to other people about what happened at the Healds' home.  As a general rule, prior out-of-court consistent statements are inadmissible hearsay unless "offered to rebut an express or implied charge against [the declarant] of recent fabrication or improper influence or motive."[67]  But Ann's parents' testimony only explained that Ann had talked with others, specifically her grandmother and her therapist.  The testimony did not include any hearsay statements that Ann or anyone else made during those conversations and never suggested that Ann's various statements were consistent or truthful.  Heald contends that "an inference could be drawn that [Ann] was telling the truth"[68] from the

---

[66] *See Green*, 2016 WL 4699156, at *2 (holding that the sexual assault nurse's testimony that "she believed what the victim told her about what happened" vouched for the credibility of the victim); *Whittle*, 77 A.3d at 241 (holding that the prosecutor improperly vouched for several witnesses "by stating that they were 'right' or 'correct' at least 20 times"); *Capano*, 781 A.2d at 595 (finding the testimony of a witness's lawyer improperly vouched for the witness's credibility because it implicitly suggested that the witness would tell the truth).

[67] D.R.E. 801(d)(1)(B).

[68] Opening Br. at 16.

prosecutor's statement during her closing argument that Ann told multiple people about what happened at the Healds' house. But the parents' testimony did not suggest that Ann had made prior consistent statements during these conversations.[69] And, as the State observes, "the fact that Ann spoke to others was part of the facts of the case; it was how the investigation unfolded."[70] Accordingly, we find that it was not an abuse of discretion for the Superior Court to allow Ann's parents to testify that Ann had talked with others about what happened at the Healds' house.

### 3. Ann's Hearsay Statement to Her Father

We turn next to Heald's challenge to the admission of Ann's father's testimony that, upon her return from her friend's home, Ann confided that her friend's uncle had touched her inappropriately. The manner in which this statement came before the jury was unusual and warrants careful review.

During a conference immediately before jury selection, counsel alerted the court to a dispute regarding the admissibility of Ann's statement during the CAC interview that she had told several other people—her parents and her grandmother— what happened to her at the Healds' house. In arguing for the statement's admissibility, the prosecutor represented that "the State was willing to take out the

---

[69] For this reason, Heald's reliance on D.R.E. 801(d)(1)(B), the United States Supreme Court decision in *Tome v. United States*, 513 U.S. 150 (1995), and this Court's decision in *Stevenson v. State*, 149 A.3d 1187 (Del. 2016), is misplaced. Contrary to Heald's contention, the Court did not permit Ann's parents to testify that Ann made a prior consistent statement.
[70] Answering Br. at 12.

part that goes into detail of what [Ann] said, but just [retain] that she had told them, period."[71]  The prosecutor then explained why the statement was relevant:

> These are facts of the case.  This is how the investigation unfolded.  She had to tell these people who she trusted.  [She] [g]ot to the therapist and the therapist is the one who reported to the New Castle Police Department.  So the State doesn't want a large gaping hole in its case as to this child doing the right thing and telling people.  I understand the defense doesn't want the hearsay part of it.  I think there are reasonable objections to the hearsay part of it. . . .  But as far as the redactions for the interview, the State does object.  We need to be able to present that this victim did tell the interviewer when asked that she spoke to these particular people.[72]

Defense counsel responded that, even though the CAC interview might be admissible, impermissible hearsay within the interview should be excluded.  In the defense's view, "the fact that she also . . . told these other people is hearsay [and] it's bolstering," because "the implication [was] . . . it must be true because she told these other people the same thing."[73]

The discussion then turned to the topic of Ann's parents' testimony.  Defense counsel forewarned the court that, should the State attempt to elicit testimony from the parents about what Ann told them, he intended to object.  The prosecutor responded that "with the dad, . . . it's . . . [an] excited utterance.  The child is still under the stress of the event.  She specifically says I was over [at the Healds'] house

---

[71] App. to Opening Br. at A12.
[72] *Id.*
[73] *Id.*

24

and I was touched. *She does not go into any more detail really than that.*[74]  In support of its reliance on the excited-utterance exception to the hearsay rule, the prosecutor offered that the Healds' house was "no more than a block"[75] from Ann's home, but no estimation of the time lapse between the purported startling event and the conversation between Ann and her father.  The Superior Court deferred its ruling on the admissibility of the father's testimony about the conversation, presumably so the record could be fleshed out and the foundation laid for considering the testimony under the excited-utterance exception.

Although generally inadmissible, a hearsay statement may be admitted at trial under an exception to the rule against hearsay "where the declaration has some theoretical basis making it inherently trustworthy. . . .  [But] absent some special indicia of reliability and trustworthiness, hearsay statements are inadmissible."[76]  Under the excited-utterance exception, an out-of-court statement is admissible if it is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."[77]  This Court has delineated the admissibility requirements under D.R.E. 803(2) as follows: "(1) the excitement of the declarant must have been precipitated by an event; (2) the statement being

---

[74] *Id.* at A13 (emphasis added).
[75] Trial Transcript at 23:1, *State v. Heald*, No. 1901004218 (Del. Super. Ct. Sept. 10, 2019).
[76] *Smith v. State*, 647 A.2d 1083, 1088 (Del. 1994).
[77] D.R.E. 803(2).

25

offered as evidence must have been made during the time period while the excitement of the event was continuing; and (3) the statement must be related to the startling event."[78] "Statements qualifying as excited utterances are deemed reliable because the person making the statement under these conditions 'is not in a position to fabricate and will exclaim the truth.'"[79] Put differently, "[t]he assumption underlying the hearsay exception of Rule 803(2) is that a person under the sway of excitement temporarily loses the capacity of reflection and thus produces statements free of fabrication."[80] This Court has held that, in determining whether an out-of-court statement is admissible under the excited utterance exception, no one factor is dispositive and that "a court must carefully consider all the factors present."[81] In addition to the time that has elapsed since the exciting event is not dispositive, a court may also consider "the nature of the startling event, whether the statement was made in response to questioning, the nature of the declarant, and whether the statement is self-serving."[82]

Here, Ann's father testified that, upon arriving home, Ann was "extremely upset," "scared," and "crying."[83] And that Ann was upset when she left the Healds' home is supported by other testimony. But, after the alleged incident, Ann continued

---

[78] *Gannon v. State*, 704 A.2d 272, 274 (Del. 1998).
[79] *Culp v. State*, 766 A.2d 486, 490 (Del. 2001).
[80] *Id.* (quoting *Miller v. Keating*, 754 F.2d 507, 512 (3d Cir. 1985)).
[81] *Id.* at 491.
[82] *Id.* at 491 n.7.
[83] App. to Opening Br. at A20.

26

to play the game with Heald, and she remained at the Healds' home after telling the other children that she felt uncomfortable. While still at the Healds' home, Ann called her father on the phone and talked to him, without mentioning anything about the alleged incident. After arriving home, and only after being questioned by her father about what had happened, Ann told her father that her friend's uncle had touched her inappropriately.[84] The record is unclear about how much time had elapsed between the alleged touching and Ann's statement to her father. Yet despite this gap in the foundation and the fact that Ann's statement to her father was in response to his questions, the court found that the State had laid an adequate foundation for the admission of the statement as an excited utterance.

The trial court's conclusion may very well have been the correct one. But except for the father's testimony establishing that Ann was "extremely upset" when she returned home that day, it is unclear to us whether the trial court considered all the relevant circumstances before finding that the challenged statement was an excited utterance within the meaning of D.R.E. 803(2). As noted above, there were several intervening events between the alleged incident and Ann's conversation with her father. Moreover, there is no estimation of how much time had passed before Ann's statement to her father. And that the most critical of Ann's statements to her

---

[84] Given Ann's age, we assume that these were not her precise words and that they likely represent her father's interpretation of what she told him.

father was made in response to his question might—but does not necessarily— suggest reflection rather than spontaneity. To be sure these factors are not dispositive, but, as we said in *Culp*, "a court must carefully consider all the factors present."[85] Accordingly, we urge the Superior Court, on remand, to revisit its ruling and to conduct a more detailed analysis of the foundation laid for the admission of Ann's statement under the excited-utterance exception.

### C. Testimony of the CAC Forensic Investigator

Heald argues that the testimony of Amy Kendall, the CAC investigator who interviewed Ann following the alleged incident at the Healds' house, improperly vouched for Ann's credibility. Heald asserts that, by explaining her training and experience and the CAC's process for obtaining statements from victims or witnesses of a crime, "the introduction of this irrelevant testimony created a substantial risk that the jury believed that the investigator's skills and methods induced a truthful statement."[86] Relying on this Court's decision in *Richardson v. State*,[87] Heald claims that the Superior Court erred by permitting Kendall to discuss matters beyond the authentication of Ann's CAC statement at trial. The State says that *Richardson* is distinguishable and that the Superior Court did not err in admitting Kendall's testimony because her testimony "was relevant and helpful to

---

[85] *Culp*, 766 A.2d at 491.
[86] Opening Br. at 17–18.
[87] 43 A.3d 906 (Del. 2012).

28

the jury because it provided context to the interview."[88]  At trial, Heald did not object to Kendall's testimony.  Thus, we review his challenge to the admission of Kendall's testimony for plain error.[89]

In *Richardson*, the CAC investigator testified about her background, training, and the CAC's interview techniques, including a detailed account of the RATAC protocol[90] for interview children.  The investigator explained that the interview "is a process of uncovering what happened and talking about it" and opined that "it's very obvious when [the children] are being truthful."[91]  This Court held that admission of the CAC investigator's testimony constituted "plain and reversible error" because her testimony "served no purpose other than to validate the interview process, and its ability to draw out the truth from child victims."[92]

Here, like the CAC investigator in *Richardson*, Kendall discussed her training and experience as well as the CAC interview process.  But unlike the investigator's testimony in *Richardson*, Kendall did not suggest that the interview process was designed to evoke truthful responses.  We note the similarity between Kendall's testimony and investigator's testimony in *Richardson* and reiterate the guidance that

---

[88] Answering Br. at 21.
[89] *Green*, 2016 WL 4699156, at *2.
[90] The CAC interviewer explained that in the RATAC protocol the "R" stands for rapport, the "A" stands for anatomy, the "T" stands for touch, the "A" stands for abuse, and the "C" stands for closure.  *Richardson*, 43 A.3d at 909–10.
[91] *Id.* at 910.
[92] *Id.* at 911.

29

we have previously set forth that, where "voluntariness of the statement is not in issue, the [CAC] interviewer's testimony should be limited to authentication."[93] But we find that Kendall did not improperly vouch for Ann's credibility. Thus, the Superior Court did not commit plain error by admitting Kendall's testimony.

## III. CONCLUSION

Because we conclude that the prosecutor's improper comments during her closing argument compromised the fairness and integrity of Heald's trial, we reverse the judgment of the Superior Court and remand for a new trial consistent with this opinion.

---

[93] *Id.*