IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAULRON CLARK, | § | |
| | § | No. 98, 2025 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No: 2311012390 A/B (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |
| | § | |

Submitted: March 25, 2026
Decided: June 8, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

Anthony J. Capone, Esquire, (*argued*); Lauren N. Brown, Esquire, OFFICE OF THE PUBLIC DEFENDER, Wilmington, Delaware, *for Appellant Paulron Clark.*

Julie M. Donoghue, Esquire; Kenneth Nachbar, Esquire (*argued*), DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

Paulron Clark was convicted in the Superior Court of several sexual offenses committed against a child. He now seeks reversal of those convictions on myriad grounds. In a nutshell, Clark contends that his convictions were the product of prosecutorial misconduct and the trial court's flawed evidentiary rulings. Because Clark's arguments lack merit, we affirm his convictions.

I

A

Clark and Leandra Moore met in 2009 and "start[ed] dating as boyfriend and girlfriend"[1] in June 2020, when Moore's daughter, S.M., was nine years old. When S.M. turned eleven—she was then in the sixth grade—her behavior deteriorated, and her grades began to slip. S.M.'s school apprised Moore of her daughter's problematic behavior.

Around this time, Moore also learned that S.M. was flirtatiously corresponding online with adults, including a purported online boyfriend named Aden, who was allegedly in his 20s. Concerned that her daughter was vulnerable, Moore took away S.M.'s electronic devices. Eventually, however, S.M. told Moore

---

[1] App. to Opening Br. at A469.

2

that she had been using her school-issued Chromebook to communicate with Aden online.

On the morning of January 19, 2023, Moore shared her concerns regarding S.M.'s online safety with the school's principal, Jane Manley. Moore asked Manley to keep S.M.'s Chromebook from her when she was not actively using it for school assignments.

Later that day, Manley and Karen Banta, one of S.M.'s teachers, met with S.M. to discuss online safety concerns and her online communications with strangers. During the meeting, Banta asked S.M. if everything was okay at home. In response, S.M. wrote a note that read: "My mom's boyfriend has been sexually harassing me. I tried to tell my mom a while ago, but she said[,] 'That's what happens when you fight with him.'"[2] After reviewing the note, Manley contacted law enforcement.

B

That same day, the Wilmington Police Department assigned Sergeant Sarah Bozeman to investigate S.M.'s allegations. Because of S.M.'s age, Sergeant Bozeman scheduled a forensic interview of S.M. at the Children's Advocacy Center ("CAC").

---

[2] State's Ex. 2.

During her interview, S.M. described how Clark had touched her inappropriately. According to S.M., Clark had, most recently, "barged in" to her room, touched her "chest area" over her clothes, and told her that he only did it because he thought she "liked it."[3] S.M. told him to "stop," and he left to "take a shower."[4]

S.M. also described an incident that had occurred a year and a half earlier, when Clark had touched her "down there area."[5] As S.M. described it, she had been in her room and her mother had been somewhere else. Clark came into her room and put her in a position where she could not move. Clark then pulled S.M.'s pants and underwear half-way down, and used his mouth to touch her "down there area." S.M. also explained that Clark had made her touch his penis on several occasions.

During the CAC interview, S.M. disclosed that Clark had told her that "[i]f [she] let [him] touch [her] chest area, [he would] do this and that,"[6] which she understood to mean that Clark would purchase S.M. Nintendo video games and give her iPad back. S.M. said that Clark showed her a video on his phone of Moore touching him "down there" with her hands and her mouth. She also said that Clark showed her the video when he first started touching her when she was nine years

---

[3] App. to Answering Br. at B1, at 13:13–20:13.
[4] *Id.* at 20:20.
[5] *Id.* at 21:53.
[6] *Id.* at 35:40.

old.  Watching the video made her "uncomfortable," and she "almost want[ed] to puke."[7]

On March 16, 2023, Sergeant Bozeman obtained a warrant (the "First Warrant") to seize and search Clark's cell phone.  In her affidavit and application for the warrant, Sergeant Bozeman recounted S.M.'s statement that Clark had showed her the video of her mother and Clark.  The application then sought authority to search the phone "to determine if there are any visual recordings contained in the phone that depict the sexual act described by [S.M.]."[8]  The resulting warrant authorized the search of "all visual recordings, multi-media messages, text messages, and any other information/data pertinent to this investigation within the time frame of July 20, 2020 to November 30, 2021."[9]  From the search, law enforcement recovered six videos depicting Moore performing fellatio on Clark.

C

S.M.'s allegations prompted Clark's arrest.  A grand jury later indicted Clark on one count of rape in the first degree; one count of sexual abuse of a child by a person in a position of trust, authority, or supervision in the first degree; one count of sexual abuse of a child by a person in a position of trust, authority, or supervision

---

[7] *Id.* at 50:20.
[8] App. to Opening Br. at A36.
[9] *Id.* at A33.

in the second degree; three counts of unlawful sexual contact in the first degree; one count of continuous sexual abuse of a child; one count of dangerous crime against a child; one count of sexual extortion; one count of sexual solicitation of a child; and one count of sexual offender unlawful sexual conduct against a child.

On January 18, 2024—ten months after the police searched Clark's cell phone and less than a month before his indictment—this Court issued a decision addressing the constitutionality of search warrants seeking "any and all data" on a suspect's phone.[10] In light of that decision, the State was uncertain about the constitutionality of the First Warrant and, on May 1, 2024, Bozeman obtained a second, narrower warrant (the "Second Warrant") to search Clark's phone. This warrant limited the search of Clark's phone to "all visual recordings and associated data that notes the date, time, and/or location of when the visual recordings were created, downloaded, and/or accessed within the time frame of July 20, 2020 to November 30, 2021."[11]

Clark filed a motion to suppress the video evidence recovered from the search of his phone, challenging the validity of the First Warrant. For the purpose of this appeal, one ground for Clark's motion is relevant: that the First Warrant was so "unconstitutionally overbroad and insufficiently particular"[12] as to constitute a

---

[10] *Terreros v. State*, 312 A.3d 651 (Del. 2024).
[11] App. to Opening Br. at A72.
[12] *Id.* at A29.

6

constitutionally prohibited general warrant. Clark later filed a supplemental motion to suppress, this time challenging the validity of the Second Warrant.

In response, the State argued that the First Warrant was distinguishable from the warrants this Court has in other cases deemed "general" and thus violative of the defendant's constitutional right to be free from unreasonable search and seizure. The State argued in the alternative that, because the application for the more particularized Second Warrant did not rely on evidence seized under the First Warrant, it was a valid warrant whose fruits should not be suppressed. Implicit in the State's alternative argument was the invocation of the independent-source doctrine. Under that doctrine, "even if police engage in illegal investigatory activity, evidence will be admissible if it is discovered through a source independent of the illegality."[13]

After hearing oral argument, the trial court issued a memorandum opinion, finding that, although the First Warrant was overbroad, it did not permit "an exploratory general rummaging of [Clark's] phone"[14] and thus was not a general warrant. And as an overbroad warrant, according to the court, it could be "redact[ed]"[15] in a manner that would not exclude the State's "evidence of the visual

[13] *Norman v. State*, 976 A.2d 843, 859 (Del. 2009).
[14] *State v. Clark*, 2024 WL 4025008, at *4 (Del. Super. Ct. Aug. 29, 2024).
[15] *Id.*

recordings obtained from [Clark's] iPhone from the specified time frame."[16]  The court also found that, because the application for the Second Warrant did not rely on any evidence discovered upon the execution of the First Warrant, any "evidence obtained from it need not be suppressed."[17]

## D

Less than a week before Clark's trial was set to begin, he filed two motions *in limine*, one to exclude the sexually explicit videos extracted from his phone and the other to allow him to introduce Instagram messages that, he claimed, "demonstrat[ed] that [S.M.] had sexual knowledge and a motive to fabricate sexual abuse allegations."[18]

In his motion to exclude the sexually explicit videos, Clark offered to "stipulate that videos of Mr. Clark, depicting consensual sexual encounters between Mr. Clark and his paramour, existed on Mr. Clark's cell phone."[19]  Relying on that concession, he argued that the videos themselves were no longer relevant to a disputed fact.  Citing Delaware Rule of Evidence 403, Clark contended further that, even if relevant, the probative value of the videos—especially considering his stipulation—was substantially outweighed by the danger of unfair prejudice and

---

[16] *Id*.

[17] *Id.* at *5.

[18] App. to Opening Br. at A169.

[19] *Id*. at A160.

needlessly presenting cumulative evidence.  The trial court disagreed, finding the videos to be "specifically relevant to the charge of sexual solicitation of the child . . . [with] significant probative value" to the State's argument that Clark had "groomed" S.M.[20]  The court did, however, limit the State's presentation to one of the six videos, which was supplemented by the parties' stipulation that there were in fact six video recordings on Clark's cell phone of Clark and Moore engaging in sexual acts.  The stipulation provided the date range within which the recordings were made and described the sexual acts as "the act of fellatio on [Clark] with [Moore's] hands and mouth."[21]

In his second motion *in limine*, Clark asked the trial court to conduct a hearing *in camera* under 11 *Del. C.* § 3508 to consider the admissibility of certain Instagram messages between S.M. and third parties.  According to Clark, "[t]he messages utilize[d] adult terminology, which tends to show that [S.M.] had greater sexual knowledge than was demonstrated at the Child Advocacy Center interview."[22]  Clark also alleged in his motion that one of the messages suggests that S.M. would fabricate sexual assault allegations.  The trial court denied the motion, concluding

---

[20] *Id*. at A205–06.  In this context, we understand "grooming" to mean "build[ing] a trusting relationship with (a minor) to exploit them especially for nonconsensual sexual activity." *Groom*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/groom (last visited May 28, 2026).

[21] Ct.'s Ex. 1.

[22] App. to Opening Br. at A168.

9

that § 3508, which governs the procedure for considering the admissibility of "the sexual conduct of the complaining witness . . . offered to attack the credibility of the complaining witness . . . ,"[23] was inapplicable. The court did say, however, that it would "allow a brief inquiry and some [cross]-examination by defense counsel . . . as to whether or not [an] initial report [S.M.] made concerning another person was . . . false."[24]

With these motions resolved, Clark's trial began. It did not take long before the prosecution's case hit a snag.

E

After opening statements, the State called S.M. as their first witness. During direct examination, the State asked S.M. if she told the truth to the CAC interviewer and her teachers when she described Clark's sexual misconduct, and S.M. answered "No."[25] When asked what "No" meant, S.M. provided no response.[26] The State then asked S.M. if she was telling the truth when she said that Clark touched her in ways she did not like. S.M. answered "No."[27] And then the following exchange occurred:

THE STATE: Okay. How are you feeling right now?

S.M.: (No response.)

---

[23] 11 *Del. C.* § 3508(a).
[24] App. to Opening Br. at A244.
[25] *Id.* at A358.
[26] *Id.*
[27] *Id.* at A359.

10

THE STATE:  Do you need a minute?  Okay.  We can take a break.
[To the court:]  Can we take a break?  I won't talk to her.

THE COURT:  Yeah.  5-minute recess, please.[28]

After the jury was excused and left the courtroom, the prosecutor approached S.M. and announced: "I'm not going to say anything.  I'm just going to give her a hug."[29]   This drew an objection from Clark's counsel.   The prosecutor was undeterred; without awaiting the court's ruling on the objection, she stated, "I care about her, Your Honor, a lot," and embraced S.M. on the witness stand.[30]

After the prosecutor hugged S.M., the Superior Court *sua sponte* questioned S.M. about her understanding of and ability to tell the truth.   The court's questioning was extensive; given the centrality of this break in the trial to Clark's lead argument on appeal, we reproduce it here in full:

> THE COURT:  Okay.  [S.M.], . . . . And you know why we're here today, right?  Okay.  You swore a few minutes ago on a Bible.  Do you remember when this lady came up, and you swore that you would tell the truth?
>
> S.M.:  (Witness nods head).
>
> THE COURT:  And you promised to do that, and put your hand on the Bible. That's all that anybody in this courtroom wants you to do today, all right? And that is all that you need to think about, is telling the truth, okay? And if what you just indicated is the truth, that's fine. And if it's

---

[28] *Id.*
[29] *Id.* at A359.
[30] *Id.* at A359–60.

11

not, the Court needs you to tell the truth about this today. Do you understand that?

S.M.: (Witness shakes head[].)

THE COURT: Do you think you can do that?

S.M.: (Witness shakes head.) (Witness crying.)

THE COURT: Just look at me for a minute. Do you think you can tell the truth today?

S.M.: (No response.)

THE COURT: At the present time, pretend that nobody else is here, do you think you could just tell us the truth, whatever that is?

S.M.: (No response.)

THE COURT: And you don't need to worry about anything in the future at all, okay? Just the truth. And the only person that we have here today that's able to do that is you, okay? If I bring the jury back, can you tell them the truth, whatever that may be? [S.A.]?

S.M.: (Witness nods head.)

THE COURT: We're just asking you a question. Can you tell the truth? And if you can't, tell me why. All right. Do you think that -- do you think that you can tell the truth in this courtroom today? That's a yes or no. What do you think?

S.M.: (Witness shakes head.)

THE COURT: You can't tell the truth? Okay. Why?

S.M.: Too much pressure.

THE COURT: It's too much pressure?

S.M.:  (Witness shakes head in the affirmative.)

THE COURT:  Is there anything that would make that pressure better right now for you?

S.M.:  (Witness shakes head no.)

THE COURT:  Do you think if we take a break for an hour or so, and you have an opportunity to talk to somebody about the pressure, that you could come back in and tell the truth?

S.M.:  (Witness shakes head in the affirmative.)

THE COURT:  Okay. All right. So how about we do this, how about we take a recess, until 11:30. And during that time, you talk to whomever you need to talk to, okay? And I don't mean about what you're going to say, because you're under oath and you shouldn't be talking to anybody about what you're about to say under oath, okay? But if you need some other support, you can try to get that during that amount of time, maybe have a little bit of water and something to eat, and then we'll reconvene this court, and I will ask you again whether or not you can tell the truth, okay?

S.M.:  (Witness shakes head affirmative  [*sic*].) . . . .

THE COURT:  Very good. All right. We're in recess for an hour.[31]

The court recessed for an hour, after which Clark requested to *voir dire* S.M. to determine whether S.M. was influenced during the break.  S.M. testified that she did not discuss her testimony with anyone while under oath but did spend the recess with a victim-services specialist for the State.

When the trial resumed, S.M. withdrew her pre-break recantation:

---

[31] *Id.* at A360–64.

13

THE STATE:  I asked you if what you said to the CAC interview lady about Pauly touching you inappropriately, whether that was the truth. And I think you said no.  Is that still your answer?

S.M.:  No.

THE STATE:  What is your answer?

S.M.:  Yes.

THE STATE:  And just to clarify, was what you told the CAC interviewer about Pauly touching you inappropriately, was that the truth?

S.M.:  Yes.[32]

S.M. then reiterated that Clark had touched her with his hands and mouth and had showed her a cell phone video of her mother and Clark.

Clark moved for a mistrial, arguing that the prosecutor's hug, the hour recess, and the consultation with the State's victim-services specialist during the break improperly induced S.M. to retract her prior testimony.  The court denied the motion, concluding that the circumstances did not warrant the extreme remedy of a mistrial. Instead, the court allowed Clark to cross-examine S.M. and anyone with whom she spoke during the break to cast doubt on S.M.'s credibility.

In addition to S.M.'s testimony, the State's case-in-chief consisted of testimony from Karen Banta; Sergeant Bozeman; the CAC's forensic interviewer,

---

[32] *Id.* at A375–76.

14

Leandra Moore, and Carly Davis, the previously identified victim-services specialist. The State also introduced the note that S.M. handed to Banta and the school principal during the January 19, 2023 meeting, the video clip from Clark's cell phone, and the stipulation to the existence and content of the other clips.

According to Banta, when S.M. passed her the note, she and the principal were "stunned."[33] Banta then asked S.M. "if [Clark] had sex with her, if they had sex, and she said yes."[34]

The CAC forensic interviewer, Kimberly Carpenter, after describing how she was trained to interview children who were the alleged victims of sexual or physical abuse, recounted her interaction with S.M. The State then played the recorded interview, the substance of which we summarized earlier.

The State's direct examination of Leandra Moore revealed her allegiance to Clark—in the interim between Clark's arrest and the trial, the two had married—and consequent cooperation with Clark's counsel and corresponding lack of cooperation with the prosecution.

After the State rested, Clark called his counsel's investigator who read from a memorandum written after the investigator interviewed S.M. seven months before

---

[33] *Id*. at A276.
[34] *Id*. at A277.

trial. The memorandum outlined how S.M. told the investigator that Clark never touched her and that "she lied to everyone about the incident."[35] Clark did not testify.

The State then recalled the victim-services specialist who had spoken with S.M. during the break. The specialist recounted that, according to S.M., her mother "made her promise to say that it did not happen when she took the stand."[36] On cross-examination, Clark confronted the victim-services specialist about S.M.'s mid-testimony conversations during the recess. The victim-services specialist responded, "I think it relates [to S.M.'s testimony], but it's not her speaking about what she said when she was in this room. She was talking about the pressure she was facing external of being in this space."[37]

The jury was charged with determining whether to believe, on the one hand, S.M.'s statement to her teacher and principal, to the CAC forensic interviewer, and to the court and jury after the break in her testimony, or, on the other hand, her statement to Clark's lawyer. The jury favored the former and found Clark guilty of all charges.

On October 22, 2024, the Superior Court conducted a bench trial on Clark's charge of sex offender unlawful sexual conduct. The Superior Court found Clark

---

[35] *Id*. at A578.
[36] *Id*. at A585.
[37] *Id.* at A588.

guilty. On February 21, 2025, the Superior Court sentenced Clark to 137 years of level V incarceration, suspended after 107 years, followed by declining levels of supervision. Clark appealed.

F

Clark's appeal rests on five grounds: first, that the Superior Court erred in denying his motion for a mistrial after S.M. changed her testimony following the mid-testimony recess; second, that the Superior Court abused its discretion by admitting an unfairly prejudicial video of explicit sexual acts between Clark and the victim's mother; third, that the Superior Court erroneously denied his motion to suppress evidence collected from his cell phone under the two warrants, one of which, he alleges, was an unconstitutional general warrant; fourth, that the Superior Court improperly determined that certain Instagram messages were inadmissible for the purpose of attacking the victim's credibility; and, fifth, that the Superior Court plainly erred by failing to prevent the prosecutor from vouching during her rebuttal.

II

A

Clark's lead argument on appeal is that the trial court erred by not declaring a mistrial after S.M. changed her testimony following her interaction with the prosecutor (the embrace) while on the witness stand, the colloquy with the court, and the contact with the victim-services specialist during the one-hour recess.

17

Whether a mistrial should have been declared rested within the trial judge's discretion.[38] A trial judge's decision to declare a mistrial is judged by this standard because "[a] trial judge is in the best position to assess the risk of any prejudice resulting from trial events."[39] We will reverse a trial judge's ruling on a mistrial application "only if it is based upon unreasonable or capricious grounds."[40]

Clark does not take issue with these review principles. Instead, he argues that no remedy short of a mistrial could "cure[] the egregiously prejudicial impact of the State's key witness, a minor, contradicting her earlier exculpatory testimony after being improperly influenced at a critical juncture by repeated prosecutorial misconduct and repeated questions about her honesty raised by the trial court."[41]

Our careful examination of the record surrounding S.M.'s testimony leads us to conclude that, because the prosecutor's interaction with S.M. was outside the jury's presence, the trial judge's questions and comments were appropriately neutral, and S.M.'s communications with the victim-services specialist were benign and the subject of cross-examination by Clark, the trial judge's denial of Clark's mistrial application was not unreasonable or capricious.

---

[38] *Revel v. State*, 956 A.2d 23, 27 (Del. 2008) (citations omitted).
[39] *Brown v. State*, 897 A.2d 748, 752 (Del. 2006).
[40] *Revel*, 956 A.2d at 27.
[41] Opening Br. at 16.

We are not persuaded that the prosecutor's conduct was motivated by a desire to influence S.M.'s testimony or that it had that effect. Accordingly, and especially because the prosecutor's interaction with S.M. was not witnessed by the jury, we do not view that interaction as misconduct on the prosecutor's part. This is not to say, however, that we condone the prosecutor's embrace of S.M. in open court and over Clark's objection. Although this interaction occurred outside the jury's presence and, for that reason, did not affect the verdict, it was visible to the defendant and members of the public in attendance, who, having witnessed the emotional embrace, might reasonably question the prosecutor's professional detachment and objectivity. To be sure, the lawyers who try cases fraught with emotion are not expected to check their humanity at the courtroom door. But, in criminal trials, interactions with a witness in full public view that evidence a deep personal relationship between the State's lawyer and the witness are likely to compromise, if not the integrity of the trial, the defendant's and the public's perception of the fairness of the proceedings.

Just as prosecutors must take care not to engage in manifestly personal or affectionate interactions with the State's witnesses, trial judges should tread lightly when questioning witnesses—especially those of tender years—about the truthfulness of the testimony they have given. On the one hand, it is not per se improper for a trial judge to remind a witness that she is required by law to tell the truth. On the other hand, repetitive questioning of a child witness during her

19

testimony about her ability to tell the truth could send a signal to the witness that the court harbors doubts about the truthfulness of the testimony already given. This runs the risk of unduly influencing the witness's testimony going forward.

Here, however, the court was confronted with a frightened and at times unresponsive child witness. We are satisfied that the trial judge's questioning of S.M. was designed to put S.M. at ease and not to sway her testimony in any particular direction. We therefore reject Clark's contention that the judge's questioning improperly influenced S.M.'s testimony.

We turn lastly to the communications between the State's victim-services specialist and S.M. during the recess. For starters, we note that the trial judge cautioned S.M. not to discuss the substance of her testimony with anyone during the break. During that recess, the prosecutor did not talk to the victim about her testimony. Even so, citing our decision in *Buckham v. State*,[42] Clark contends that the mid-testimony consultation between S.M. and the specialist improperly influenced her testimony.

In *Buckham*, we concluded that the trial court committed reversible error when it granted a mid-testimony recess at the prosecutor's request so that a prosecution witness whose trial testimony began to stray from his previous statements to police

---

[42] 185 A.3d 1 (Del. 2018).

could consult with his lawyer.  We discussed at length how "allowing a witness to consult with counsel in the midst of questioning is fraught with the risk of interfering with the truth-seeking process."[43]  But *Buckham* is distinguishable from this case in two important ways.

In the first place, the mid-testimony communication here was not between S.M. and her lawyer or the prosecutor.  Instead, S.M. spoke with a victim-services specialist—that is, a social worker—who did not discuss the substance of S.M.'s testimony, but merely tried to assure S.M. that she could tell the truth on the stand without fear of repercussions.  In this regard, the challenged interaction looked more like the circumstances presented in *Frierson v. State*,[44] an Indiana appellate court decision that we distinguished from Buckham's case.  In *Frierson*, the trial court recessed the trial to allow an emotionally upset rape victim to regain her composure.  On appeal, the Indiana Court of Appeals, recognizing that the recess did not appear "to have promoted an opportunity for the State to coach the victim's testimony,"[45] held that "[t]he trial court was well within its discretion to allow communications between the State and the victim if it determined that such communications would help console the victim."[46]  So too here.

---

[43] *Id*. at 9.
[44] 543 N.E.2d 669 (Ind. Ct. App. 1989).
[45] *Id*. at 673.
[46] *Id*.

In addition to that, unlike in *Buckham*, here the trial court allowed Clark's counsel to cross-examine both S.M. and the victim-services specialist concerning their communications during the break. This ruling hewed to our observation in *Buckham* that, "if a court is convinced that there is a legitimate need for a mid-testimony consultation, making the consultation fair-game for inquiry lowers the danger that it will corrupt the proceeding."[47] As the trial proceeded, the examination of S.M. and the victim-services specialist did not elicit any evidence of improper influence or coaching.

In sum, the trial court did not abuse its discretion when it denied Clark's request that it declare a mistrial.

B

Clark also contends that the Superior Court erred by allowing the jury to view an explicit video of Clark having sexual relations with Moore, the victim's mother. More specifically, Clark alleges that, because he stipulated that six video recordings depicting Moore's "performing the act of fellatio on him,"[48] the substance of the

---

[47] *Buckham*, 185 A.3d at 11.

[48] The jury was informed that the State and Clark stipulated that "on or between the 20th day of July, 2020 and the 30th day of November, 2021 six video recordings of [Clark] and his paramour, Leandra Moore, engaged in sexual acts existed on [Clark's] cell phone. All six recordings specifically depict Leandra Moore performing the act of fellatio on [Clark] with her hands and mouth." Ct.'s Ex. 1.

video was cumulative and that any negligible probative value it provided was substantially outweighed by the danger of unfair prejudice.

"The determination of whether the probative value of a particular piece of evidence is substantially outweighed by the danger of unfair prejudice is a matter which falls particularly within the discretion of the trial court, which has the first-hand opportunity to evaluate relevant factors."[49] To secure a reversal of his convictions on this ground, Clark bears the burden of establishing a clear abuse of discretion;[50] he must show that the trial court "exceeded the bounds of reason in view of the circumstances, [or] . . . so ignored recognized rules of law or practice . . . as to produce injustice."[51] Clark's attempt to make this showing falls short of the mark.

The record demonstrates that the trial court's analytical approach to the admissibility of the video was sound. The court first assessed the video's relevance and found its content to be consistent with the State's argument that Clark used the video to "groom" S.M.[52] The court thus concluded—reasonably, in our view— that

---

[49] *Taylor v. State*, 76 A.3d 791, 802 (Del. 2013) (quoting *Williams v. State*, 494 A.2d 1237, 1241 (Del. 1985)).

[50] *Gallaway v. State*, 65 A.3d 564, 569 (Del. 2013).

[51] *Lilly v. State*, 649 A.2d 1055, 1059 (Del. 1994) (quoting *Firestone Tire and Rubber Co. v. Adams*, 541 A.2d 567, 570 (Del. 1988)).

[52] App. to Opening Br. at A206. The relevant portion of 11 *Del. C.* § 1112A—the statute under which Clark was charged with sexual solicitation—provides that "[a] person is guilty of sexual solicitation of a child if the person, being 18 years of age or older, intentionally or knowingly . . .

the video was "specifically relevant to the charge of sexual solicitation of the child."[53]

After making this relevance determination, the court consulted D.R.E. 403, under which the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." As the trial court saw it, the six videos were "certainly [prejudicial]"[54] but had "significant probative value"[55] as to the sexual solicitation charge. The court also expressed concern that "show[ing] six videos" would be unnecessarily cumulative but that playing one video for the jury would "minimize the danger of prejudice."[56]

This response to Clark's objection did not constitute an abuse of the trial court's discretion. Clark's act of showing the videos to S.M. could reasonably be viewed as an effort to legitimize his eventual sexual advances in S.M.'s eyes. Seen in that light, that he would share the videos with S.M. was probative of Clark's enticing, encouraging, and attempting to cause S.M. to engage in prohibited sexual acts in a way that would be more compelling evidence than his sterile admission in

---

[s]olicits, requests, commands, importunes or otherwise attempts to cause any child to engage in a prohibited sexual act[.]"
[53] App. to Opening Br. at A205.
[54] *Id.*
[55] *Id.* at A206.
[56] *Id.*

24

a written stipulation of fact. Allowing the jury to view one of the six videos—and a brief one at that—did not exceed the bounds of reason, ignore recognized rules, or produce injustice. Clark's claim is without merit.

C

We consider next Clark's contention that the evidence collected from his cell phone, including the videos depicting him having sexual relations with Moore, were seized under the authority of an unconstitutional general warrant and therefore should have been suppressed. Clark contends on appeal both that the First Warrant, which authorized the cellphone search to "include all visual recordings, multi-media messages, text messages, and any other information/data pertinent to this investigation within the time frame of July 20, 2020 to November 30, 2021[,]"[57] was an unconstitutional general warrant and that the Second Warrant was not insulated by the independent-source doctrine. Our review of the First Warrant leads us to conclude that it is not a general warrant. Because that issue is dispositive, we need not reach Clark's second contention regarding the independent-source doctrine.

i

The Fourth Amendment to the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

---

[57] *Id.* at A33.

supported by Oath or affirmation, and *particularly* describing the place to be searched, and the persons or things to be seized.[58]

Article I, Section 6 of the Delaware Constitution similarly provides:

> The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as *particularly* as may be; nor then, unless there be probable cause supported by oath or affirmation.[59]

Echoing Article I, Section 6, 11 *Del. C.* § 2307(a), provides that a search warrant "shall designate the house, place, conveyance or person to be searched, and shall describe the things or persons sought *as particularly as possible*."[60] "A warrant that fails to conform with the particularity requirement is unconstitutional."[61]

We have, however, recognized a distinction between a warrant that is so insufficiently particular as to constitute a general warrant, all fruits of which "must be suppressed in their entirety,"[62] and the "less constitutionally offensive"[63] overbroad warrant, which "can be redacted as to the portions of the search for which no probable cause exists."[64] Acknowledging that "the line between these two warrant categories at times can be thin," in *Terreros v. State*, we observed that "the

---

[58] U.S. CONST. amend. IV (emphasis added).
[59] DEL. CONST. art. I, § 6 (emphasis added).
[60] 11 *Del. C.* § 2307(a) (emphasis added).
[61] *Terreros*, 312 A.3d at 662 (citing *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984)).
[62] *Id.* at 663.
[63] *Id*.
[64] *Id*. (citing *United States v. Christine*, 687 F.2d 749, 758 (3d Cir. 1982)).

distinction often turns on whether the warrant allows investigators to conduct an 'exploratory rummaging,' which is indicative of a general warrant, or allows police to search in specified places or for specified items more broadly than the articulated probable cause, which is an overbroad warrant."[65]

"These principles do not change or disappear when the 'place' to be searched or 'evidence to be seized' is digital in nature."[66] In *Wheeler v. State*,[67] we reviewed a warrant application and affidavit that established probable cause only to search for physical communications—letters, notes, and books—yet authorized a search of "any and all data" stored on "any personal computer[,]" "any digital or optical data storage device[,]" "any cellular telephone[,]" and "any digital camera[.]"[68] We acknowledged that the search of a digital device presents "unique challenges in satisfying the particularity requirement."[69] Rather than adopt a "hypertechnical" test, however, we held that the "proper metric of sufficient specificity is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation."[70] Applying that standard, we concluded that the warrants at issue

---

[65] *Id.* (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)).
[66] *Id.* (quoting *Riley v. California*, 573 U.S. 373, 401–02 (2014)).
[67] 135 A.3d 282 (Del. 2016).
[68] *Id.* at 288–89.
[69] *Id.* at 299.
[70] *Id.* at 300–01.

were general warrants that "violated the particularity requirement[,]" in part because they had no temporal limitations despite relevant dates being available to police.[71]

Two years later, in *Buckham*,[72] we examined the constitutionality of a warrant authorizing the search of "[a]ny and all store[d] data contained within the internal memory of" the defendant's cell phone.[73] Although the Superior Court found probable cause to search the phone for GPS data for the purpose of determining Buckham's location and locating additional evidence, we concluded that the warrant failed to satisfy the requirements articulated in *Wheeler*. The warrant imposed no relevant time limitation, authorized the search of all data on the phone, and permitted law enforcement to examine categories of information unrelated to GPS location data. Stopping short of determining the warrant was general, we held that it was "both vague about the information sought . . . and expressly authorized the search of materials there was no probable cause to search[.]"[74] Noting that the warrant allowed investigators to conduct an unconstitutional "top-to-bottom search" of the defendant's phone,[75] we concluded that the admission of evidence seized from Buckham's cell phone—Facebook messages that bore no relationship to Buckham's location—was plainly erroneous.

---

[71] *Id.* at 304–06.

[72] *Buckham*, 185 A.3d 1.

[73] *Id.* at 4, 6 (alteration in original).

[74] *Id.* at 19.

[75] *Id.* at 18.

In *Taylor v. State*, we again held that a search warrant was constitutionally invalid on several grounds.[76]  As in *Buckham*, the warrant "authorized 'a top-to-bottom search' of '[a]ny and all store[d] data' of the digital contents of the [defendant's] devices."[77]  More than that, it imposed no relevant temporal limitation on the data to be searched.  It also used the open-ended phrase "including but not limited to" to describe the places to be searched, mirroring the language we criticized in *Wheeler* and *Buckham*.[78]  We therefore concluded that the warrant was a general warrant that "vest[ed] the executing officers with unbridled discretion to conduct an exploratory rummaging through [the defendant's] papers in search of criminal evidence."[79]

Most recently, in *Terreros*, we considered whether a warrant authorizing police to search cell phone "messages, messaging apps, photos, videos, internet search history, GPS coordinates, and incoming and outgoing calls" was constitutional despite "the only nexus between the alleged crime and the phone [being the Defendant's] internet history."[80]  Although the warrant did not authorize a search of "any and all data," we nevertheless held that it was a general warrant and that the evidence seized from Terreros's phone should have been suppressed. By

---

[76] *Taylor*, 260 A.3d 602.
[77] *Id.* at 615 (quoting *Buckham*, 185 A.3d at 18) (alteration in original).
[78] *Id.* (first citing *Buckham*, 185 A.3d at 15; and then citing *Wheeler*, 135 A.3d at 289)).
[79] *Id.* at 617 (alteration in original).
[80] *Terreros*, 312 A.3d at 655.

permitting the search of such a broad range of categories, the warrant effectively granted investigators authority to search substantially all of the phone's data. The absence of any temporal limitation—like the warrants in *Wheeler*, *Buckham*, and *Taylor*—bolstered our conclusion.

ii

Clark argues that the First Warrant was a general warrant under our decisions in *Wheeler*, *Buckham*, *Terreros*, and—in particular—*Taylor*. Because the First Warrant lacks several of the characteristics present in warrants we have previously held to be unconstitutionally general, Clark's argument fails.

The First Warrant defines the scope of the search to include "all visual recordings, multi-media messages, text messages, and *any other information/data pertinent to the investigation*."[81] Standing alone, however, this language does not mandate a determination that the First Warrant is a general warrant. In *Taylor*, we also acknowledged our "reluctan[ce] to make specific pronouncements about what is required in a search warrant for electronic devices for fear that we might tie the hands of investigators."[82] Instead, we evaluate the warrant as a whole to determine

---

[81] App. to Opening Br. at A33, A67 (emphasis added).
[82] *Taylor*, 260 A.3d at 616.

whether it granted investigators "unbridled discretion" to conduct an "exploratory rummaging" of Clark's data.[83] It did not.

Several features distinguish the First Warrant from the warrants we invalidated in *Wheeler*, *Buckham*, and *Taylor*. The First Warrant does not authorize a search of "any and all data,"[84] nor does it employ the open-ended phrase "including but not limited to" to describe the places to be searched.[85] More importantly, unlike the warrants in *Wheeler*, *Buckham*, *Taylor*, and *Terreros*, the First Warrant includes a clear temporal limitation, restricting the search to data created "within the time frame of July 20, 2020 to November 30, 2021."[86] Clark cites no cases in which we have held a warrant to be general where it imposed such a temporal restriction. Indeed, in *Thomas v. State*[87]—a case in which we held that a warrant was invalid as overbroad rather than general—the warrant contained a similar time limitation.[88] This temporal limitation, together with a lack of open-ended language, effectively limited the discretion of law enforcement when executing the First Warrant.

Applying these principles to the First Warrant, we conclude that, while close to the "thin" line that separates overbroad from general warrants, the First Warrant

---

[83] *See id.* at 617.
[84] *See* App. to Opening Br. at A33, A67.
[85] *See id.* at A33; *Taylor*, 260 A.3d at 616.
[86] App. to Opening Br. at A33, A67.
[87] 305 A.3d 683 (Del. 2023).
[88] *Id.* at 703 (explaining that the warrant only allowed officers to search for calls and text messages sent and received between February 22, 2019 and January 18, 2020).

31

lands on the overbroad side. Its overbreadth resides in its inclusion of authority to search Clark's cell phone for "any other information/data pertinent to this investigation." The overbreadth, however, is tempered by its temporal limitation and its focus on the items and areas—visual recordings, multi-media messages, and text messages—where the videos the police were looking for were likely to be found. This does not represent the type of "exploratory rummaging" through a cell phone that calls for the suppression of the discrete evidence the search for which was clearly supported by probable cause. The Superior Court did not err by denying Clark's motion to suppress that evidence.

## D

As mentioned earlier, Clark moved *in limine* "for a hearing *in camera*, pursuant to 11 *Del. C.* § 3508, to permit [the] Defense to introduce evidence of the sexual knowledge of the complaining witness."[89] The evidence Clark sought to admit consisted of Instagram messages between S.M. and third parties. According to Clark's motion, "[t]he messages utilize adult terminology, which tends to show that [S.M.] had greater sexual knowledge than was demonstrated at the Child

---

[89] App. to Opening Br. at A167.

32

Advocacy Center interview[,] [and] [o]ne such message suggest[ed] that [S.M.] should fabricate sexual assault allegations."[90]

11 *Del. C.* § 3508 establishes the procedure a defendant, who is charged with a sex crime, must follow when moving to introduce "evidence of the sexual conduct of the complaining witness" for the purpose of "attack[ing] the credibility of the complaining witness."[91]  To seek admission of such evidence, the defendant must file a written motion, supported by an affidavit, concerning the relevance of the complaining witness's sexual conduct to the witness's credibility.  If the court finds that the defendant's offer of proof is sufficient, the court will hold a hearing outside the presence of the jury and allow the questioning of the witness regarding the offer of proof.  If, after conducting the hearing, the court finds that the proffered evidence is relevant and otherwise admissible, "the court may issue an order stating what evidence may be introduced by the defendant[] and the nature of the questions to be permitted."[92]

Here, the court found that Clark's offer of proof was insufficient to warrant a hearing as to the evidence purportedly indicative of S.M.'s sexual knowledge.  Clark now argues that "[t]he trial court erred as a matter of law by (1) interpreting [§] 3508

---

[90] *Id.* at A168.
[91] 11 *Del. C.* § 3508(a).
[92] 11 *Del. C.* § 3508(a)(4).

33

as covering the materials at issue, and (2) finding that Clark's offer of proof did not satisfy [§] 3508's prima facie requirements[.]"[93]  We disagree.

To begin with, although Clark attempts to frame this appellate claim as grounded in his "constitutional rights to due process and confrontation of the witness"—a characterization designed ostensibly to invoke *de novo* review—he neither cites nor quotes the relevant provisions of either the federal or our state constitution.  In the absence of any argument or analysis by Clark to the contrary, we will review Clark's argument, which concerns an evidentiary ruling, for an abuse of discretion.[94]

Applying the abuse-of-discretion standard described earlier in this opinion, we conclude that the trial court's ruling under § 3508 did not exceed the bounds of reason or so ignore recognized rules of law or procedure as to produce injustice.  In the first place, Clark's contention that the trial court erred by "interpreting [§] 3508 as covering the materials at issue"[95] is irreconcilable with his clear statement in his motion *in limine* that the motion was filed "pursuant to 11 *Del. C.* § 3508."[96]  Having

---

[93] Opening Br. at 35.
[94] *Scott v. State*, 642 A.2d 767, 771 (Del. 1994) (considering whether the trial court abused its discretion by prohibiting testimony concerning the victim's sexual history as violative of 11 *Del. C.* § 3508).
[95] Opening Br. at 35.
[96] App. to Opening Br. at A167.

prompted the court to view his motion through that lens, he may not wave it away without explanation.

Besides that, we are satisfied by our review of the record, including the disputed messages, that the messages reflecting research on the Internet and a conversation with a peer did not constitute sexual conduct under § 3508. Nor was the trial court's determination that the messages were not highly probative of whether S.M.'s allegations against Clark were fabricated unreasonable.

This Court's decision in *Scott v. State* put it well: "The purpose of § 3508 is clear. It seeks to allow defenses based on the complainant's credibility while protecting her from unnecessary humiliation and embarrassment."[97] In this case, the trial court carefully balanced these competing interests when it excluded the proffered evidence. That was not an abuse of the court's discretion.

E

Lastly, Clark contends that the prosecutor's closing argument was marred by "[i]mproper prosecutorial vouching for the State's case."[98] He acknowledges that he did not object to the alleged vouching when it occurred and that reversal is

---

[97] *Scott*, 642 A.2d at 771 (citing *Wright v. State*, 513 A.2d 1310, 1314 (Del. 1986)).
[98] Opening Br. at 38.

required only if, under our plain-error standard, it was "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[99]

Although Clark complains that the prosecutor engaged in "repeated vouching for her case in rebuttal,"[100] he identifies only one statement—a reference to the prosecutor's embrace of S.M. outside the presence of the jury. One might reasonably question why the prosecutor would refer in her rebuttal argument to conduct that occurred outside the presence of the jury. The answer is that Clark, through his cross-examination of S.M., put the issue before the jury:

> DEFENSE COUNSEL: Now, when the jury was excused, [the prosecutor] approached you at the witness stand, right? And she gave you a hug?
>
> S.M. Yeah.
>
> DEFENSE COUNSEL: And she said that she cared about you, right?
>
> S.M. Yeah.[101]

Clark then revisited the issue in his closing argument, reminding the jury that "[S.M.] testified that right after you left the room, the prosecutor gave her a hug while she was sitting on that witness stand."[102] And although the State moved to

---

[99] *Id*. (quoting *Heald v. State*, 251 A.3d 643, 648 (Del. 2021)).
[100] Opening Br. at 37.
[101] App. to Opening Br. at A457.
[102] *Id*. at A691.

strike this argument, the court let it stand. In rebuttal, therefore, the prosecutor

defended her actions:

> Nothing at this trial from the State has been done to put on a show. The State takes this extremely seriously. We're talking about a child who, yes, I hugged after she was shaking and unresponsive on the witness stand. I hugged her then and I would hug her again.[103]

It is questionable—and thus not "plain"—that this statement is properly

characterized as improper vouching, which occurs "when the prosecutor implies

some personal superior knowledge, beyond that logically inferred from the evidence

at trial, that the witness testified truthfully."[104] But even if it were, Clark's closing

argument invited the prosecutor to defend her conduct; in our view, she did so in a

way that did not jeopardize the fairness or integrity of Clark's trial.

## III

We affirm the Superior Court's judgment and Clark's convictions.

---

[103] *Id*. at A706.
[104] *Whittle v. State*, 77 A.3d 239, 243 (Del. 2013) (quoting *White v. State*, 816 A.2d 776, 779 (Del. 2003)).